# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*People v. Nelson*, 2013 IL App (1st) 102619

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEITH NELSON, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-2619 |
| Filed<br>Rehearing denied | July 12, 2013<br>August 13, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions and sentences for aggravated criminal sexual assault were upheld over his contentions that "other crimes" evidence was improperly introduced and that the testimony of one DNA analyst involved in his case violated his right to confront the witnesses against him, since the trial judge considered the similarities and dissimilarities between the charged assault and the other offense and his decision to admit the evidence of the other assault despite the dissimilarities was not unreasonable, arbitrary or fanciful, and was not an abuse of his discretion, and the fact that the State called only the forensic supervisor of the team of technicians who performed the preliminary work leading up to the DNA analysis presented by the supervisor did not violate defendant's right to confront the witnesses against him. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-12212; the Hon. William G. Lacy, Judge, presiding. |
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Charles W. Hoffman, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Tasha-Marie Kelly, Amy M. Watroba, and Koula A. Fournier, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE REYES delivered the judgment of the court, with opinion. Presiding Justice Lampkin concurred in the judgment and opinion. Justice Gordon specially concurred, with opinion. |

**OPINION**

¶ 1   Following a jury trial held in the circuit court of Cook County, defendant Keith Nelson was found guilty of one count of aggravated kidnaping and three counts of aggravated criminal sexual assault. The trial court sentenced defendant to four consecutive 25-year terms in the Illinois Department of Corrections. Defendant now appeals, arguing: (1) the trial court erred in allowing the State to introduce "other crimes" evidence to show defendant's intent, motive and propensity to commit sex crimes; and (2) his constitutional right to confront the witnesses against him was violated by the State's presentation of expert testimony from a DNA analyst. For the following reasons, we affirm.

¶ 2                          BACKGROUND

¶ 3   Defendant was charged by indictment with aggravated kidnaping and aggravated criminal sexual assault. The charges arose from a May 26, 2006, incident in which C.G. was forcibly taken to the backyard of a building at 7214 South Calumet Avenue in Chicago, where she was sexually assaulted.

¶ 4   Prior to trial, the State filed a motion *in limine* to introduce "other crimes" evidence demonstrating defendant sexually assaulted S.C. in a separate incident. Pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2006)), the State sought to introduce this evidence to establish not only defendant's intent and motive, lack of consent, *modus operandi* and common scheme or design, but also his propensity to commit sex offenses, based on the proximity and time and similarity of the assaults against C.G. and S.C. Following a hearing, the trial court granted the State's motion, over the defendant's objection that the evidence was more prejudicial than probative.

¶ 5   The State also filed a pretrial motion *in limine* seeking to present DNA evidence through testimony from Matthew Quartaro of Orchid-Cellmark (Cellmark), a private laboratory which performs DNA analyses for law enforcement agencies, criminal defense lawyers and

private individuals. The motion indicated Cellmark conducted DNA testing in this case. The State acknowledged Quartaro "is not the analyst who performed the mechanical aspects of the DNA testing," but he was one of the forensic supervisors who bears responsibility for Cellmark's DNA testing. The State also asserted Quartaro reviewed the data generated by the analysts who worked on this case, checked the work to ensure it was done properly, verified the chain of custody and ensured the evidence was properly stored and handled, and ultimately he reached independent conclusions from the test data. At the hearing on the motion, defense counsel objected on the grounds Quartaro's testimony was hearsay and would violate defendant's right to confront the witnesses against him under the sixth amendment to the United States Constitution. The trial court granted the State's motion.

¶ 6    At trial, C.G. testified that in May 2006, she was 17 years old and living with her cousin at 7208 South Calumet Avenue in Chicago. On May 25, 2006, C.G.'s boyfriend dropped her off in front of her residence at approximately 11 or 11:30 p.m. C.G. did not have a key, so she rang the doorbell, but no one answered. C.G. told her boyfriend he could leave because her cousin's best friend, Ashley, and a boy named Jordan were sitting in a parked automobile in front of the residence. C.G. talked with Ashley and Jordan until Ashley left. C.G. and Jordan then drove the automobile around the block to get something to eat, after which they returned to the residence. According to C.G., Jordan said he had to leave, so C.G. exited the vehicle and sat on the front porch for a while.

¶ 7    C.G. testified she became impatient and decided to walk to the corner of 72nd Street and Calumet Avenue. When C.G. reached the corner she noticed a man she later identified as defendant walking toward her. C.G. turned around and commenced walking back toward her residence. According to C.G., defendant approached her and asked, "What's your name?" C.G. also testified defendant was wearing a black sleeveless shirt, shorts and a black, fingerless glove. C.G. described defendant as muscular, with "a lot of facial hair" and "a lot of tattoos." C.G. specifically noticed tattoos of the face of Jesus and a cross on his left side.[1]

¶ 8    C.G. further testified she did not want to speak to defendant, so she provided false answers to his questions. When C.G. and defendant reached the portion of the street opposite the residence, C.G. requested the use of defendant's cell phone. Defendant handed C.G. the cell phone and she dialed her cousin's telephone number, but there was no response. C.G. returned the cell phone to defendant and said goodbye.

¶ 9    According to C.G., as she stepped in front of the residence, defendant lunged at her. C.G. testified defendant attempted to grab her and she struck him. C.G. also testified defendant grabbed her right hand and bit her below the thumb. C.G. further testified defendant punched her face several times. When C.G. began screaming for defendant to stop, he placed his forearm against her throat and choked her. C.G. began to lose consciousness and fell to the ground.

¶ 10    C.G.'s next recollection was defendant walking her down 72nd Street and turning into an alley. C.G. testified she again lost consciousness and, when she regained it, realized

---

[1]Though C.G. testified the tattoo was on defendant's left side, the record on appeal includes a photograph showing these tattoos are located on defendant's left upper arm.

defendant had pinned her against the wall of a garage with his arm. According to C.G., defendant ordered her to remove her clothes. When she refused, defendant ripped her pants open and forced her to the ground on all fours. C.G. further testified defendant again choked her until she lost consciousness.

¶ 11 When C.G. again regained consciousness, defendant was inserting his penis into her vagina. C.G. told defendant to stop; defendant responded he would kill her if she did not shut up. According to C.G., defendant then inserted his penis into her anus, then again in her vagina, then again in her anus, then again in her vagina. C.G. requested defendant stop because she needed to defecate. Defendant refused to stop, responding, "If you shit on me, I'm going to kill you." C.G. further testified defendant turned her around and forced his penis into her mouth. Defendant turned C.G. around again, choking her while stating, "I bet the next time you see me you're gonna want to talk to me."

¶ 12 Defendant left the area, in the direction of 72nd Street, while C.G. remained on the ground. C.G., after waiting a while, walked toward 73rd Street then back down Calumet Avenue toward 72nd Street. C.G. testified she walked "the long way" because she was afraid to walk directly toward 72nd Street. According to C.G., she was naked below the waist, except for socks. As she approached the street, C.G. observed her cousin and screamed her cousin's name. C.G. waited on the front porch for the police to arrive. C.G. was hysterical when the police arrived and had difficulty speaking to them because her throat hurt. C.G. did not recall whether she had conversations with the first responding police officers. C.G. was subsequently transported to St. Bernard Hospital by ambulance. C.G. testified she was examined by physicians there, including swabbing of her mouth, vagina and anus.

¶ 13 C.G. acknowledged she did not know defendant prior to the incident. C.G. testified that on June 15, 2006, she spoke to a police detective at Area 2 police headquarters and worked with a sketch artist. On June 2, 2008, C.G. identified defendant as the man who sexually assaulted her on May 26, 2006, from a photo array shown to her by a police detective. On June 6, 2008, C.G. identified defendant as her attacker during an in-person lineup. C.G. also identified photographs depicting: the garage and back yard where the assault occurred; the clothing she left behind at the scene; the bite mark on her hand and bruises on her arm, elbow and face following the assault; and the tattoo of the face of Jesus she observed on defendant's left arm.

¶ 14 Latoya Jones testified that on May 25, 2006, she lived in a second-floor apartment at 7214 South Calumet Avenue. When she arrived home at approximately 10 p.m., she saw a young woman who lived at 7208 South Calumet Avenue sitting on her front porch. Later in the evening, she heard a woman's screams that sounded as though they came from her yard, or the next yard over. Jones testified she went to her window, but did not see anything. Jones did not telephone the police.

¶ 15 Chicago police officer William Stec testified he was employed as an evidence technician for the Chicago police department for the past 13 years. Officer Stec testified he was working on the evening of May 25, 2006, into the early morning hours of May 26, 2006. Officer Stec was assigned to process a crime scene located at 7214 South Calumet Avenue at approximately 2:20 a.m. Officer Stec photographed the scene and observed blue panties,

black pants, a pair of shoes and a silver belt on the grass next to the garage. Officer Stec recovered and inventoried these items. According to Officer Stec, the pants did not appear to be torn and the belt buckle was not broken off from the belt.

¶ 16   Dr. Jihun Lee testified he was an emergency room resident at St. Bernard Hospital on May 26, 2006. Dr. Lee examined C.G. and found no trauma to her external genitalia or anus, which is not uncommon in sexual assault cases. Dr. Lee observed C.G. had swelling to her left jaw, bruising on her neck, hemorrhaging and swelling around her eyes, and a bite mark on her right hand. Dr. Lee opined the injuries around her eyes could be the result of trauma or choking. Dr. Lee also identified photographs of these injuries.

¶ 17   Maria Duce testified she was a nurse at St. Bernard Hospital on May 26, 2006. Duce testified she collected samples from C.G. for a sexual assault kit. Duce swabbed C.G.'s mouth, vagina and anus and took scrapings from under C.G.'s fingernails. Duce identified the sexual assault kit she prepared.

¶ 18   The parties stipulated that if called as a witness, Nora Alberto would testify she also was a nurse at St. Bernard Hospital on May 26, 2006, and assisted in C.G.'s treatment. Alberto would testify the sexual assault kit collected by Dr. Lee was sealed and provided to Chicago police officer Robert McGivney. The parties also stipulated that if called as a witness, officer McGivney would testify he was employed as an evidence technician for the Chicago police department on May 26, 2006. Officer McGivney would also testify he received the sexual assault kit and a bag of clothing at St. Bernard's Hospital, both of which he inventoried.

¶ 19   Jennifer Bell, a forensic scientist for the Illinois State Police, testified she received the sexual assault kit for C.G.'s case on August 22, 2007. According to Bell, C.G.'s vaginal and anal swabs both tested positive for the presence of semen, but the oral swab did not. Bell preserved all of the swabs, along with C.G.'s blood standard, for DNA testing.

¶ 20   Quartaro, who supervises a team of eight DNA analysts at Cellmark, as well as testing samples himself, was declared an expert in the field of forensic DNA analysis without objection. Quartaro testified Cellmark was asked to perform forensic DNA analysis on samples under a Cellmark case number associated with a Chicago police department case number. According to Quartaro, on January 16, 2008, Cellmark received a vaginal swab, a rectal swab and a reference blood sample from C.G. to determine whether Cellmark could identify any unknown DNA from the swabs.

¶ 21   Quartaro described the procedures utilized at Cellmark, which works in an assembly line or team format, so that people who excel at specific tasks perform those specific tasks. According to Quartaro, there are individuals who examine the evidence to determine which portions are sent for DNA testing. There are also individuals who extract or purify DNA from those samples. Quartaro testified the bulk of the work is performed by robotic instrumentation in the wet chemistry lab. Finally, there are individuals who examine the data generated from this process and prepare a report.

¶ 22   Quartaro further testified that in this case, he examined the evidence received from the Illinois State Police and took cuttings to send for DNA testing. Quartaro also reviewed the data and documentation and performed the analysis on the data generated from the case. Quartaro authored the report in this case for Cellmark.

¶ 23    Quartaro testified Cellmark was able to obtain a DNA profile from the reference blood standard collected from C.G. Cellmark had information that semen previously had been identified from C.G.'s vagina and rectal swabs. A DNA profile for C.G. was identified from the swabs, as was a DNA profile for an unknown male. Quartaro further testified, over a defense objection, that the proper controls were run in this case to ensure the instruments were functioning properly. In addition, Quartaro testified, again over a defense objection, that a proper chain of custody was maintained over the samples at all times. Cellmark then shipped the remaining evidence to the Illinois State Police. Quartaro testified all of his conclusions were within a reasonable degree of scientific certainty.

¶ 24    On cross-examination, Quartaro acknowledged he did not personally receive the evidence in this case and he did not know where or under what conditions the evidence was stored prior to January 16, 2008. Quartaro also acknowledged other individuals performed the purification of the DNA samples and oversaw the robotic instrumentation in this case. Quartaro testified he analyzed the data and wrote the report and there was another person, named Kelly Bird, who conducted a technical review of his report. When defense counsel asked whether it was Kelly Bird's job to summarize what had transpired, Quartaro responded Bird's job was to review the documentation and data in the case file and then examine his report to ensure they both drew the same conclusions.

¶ 25    Defense counsel also asked how Quartaro knew Cellmark's controls were in proper order. Quartaro explained Cellmark runs two controls at each stage of the process. The first is a negative control used to ensure Cellmark is not introducing any DNA into samples during processing. The second is a positive control, which is a known sample used to determine the process is working correctly. According to Quartaro, the documentation reflected the process worked correctly in this case.

¶ 26    Chicago police detective Connolly testified that on May 30, 2008, he learned defendant's DNA was contained in a database and defendant's DNA profile matched the previously unidentified male in C.G.'s case. On June 2, 2008, he showed C.G. a photo array, from which she identified defendant as the person who sexually assaulted her on May 26, 2006. Detective Connolly testified he issued an investigatory alert for defendant, but did not obtain an arrest warrant. On June 19, 2008, Detective Connolly observed defendant at 7908 South Wabash Avenue. When Detective Connolly ordered defendant to stop, defendant ran inside, where Detective Connolly discovered him in a locked closet. Detective Connolly placed defendant in custody and escorted him to Area 2 police headquarters. Detective Connolly testified C.G. identified defendant as her assailant during an in-person lineup conducted the following day.

¶ 27    Ralph Vucko, an investigator employed by the Cook County State's Attorney's office, testified that on June 20, 2008, he took a buccal swab sample from defendant's mouth. Vucko also testified he placed the swab in a security locker and transported it to the Chicago police department on June 26, 2008.

¶ 28    Ronald Tomek, a forensic scientist employed by the Illinois State Police Forensic Science Center, was proffered as an expert in forensic DNA analysis without objection. Tomek testified that on July 2, 2008, he received defendant's buccal swab from the Chicago police

department and was able to obtain a DNA profile suitable for comparison from that swab. On July 28, 2008, Tomek compared the DNA profile he generated from defendant's buccal swab with the male DNA profile generated by Cellmark from the vaginal and rectal swabs taken from C.G. Using a chart with columns representing the profiles generated from the buccal, vaginal and rectal swabs, Tomek opined the DNA profiles matched at each of the 13 loci tested. According to Tomek, that particular profile is expected to occur in approximately 1 in 2.5 quintillion blacks, 1 in 107 quintillion whites, and 1 in 25 quintillion Hispanics. Tomek opined the DNA profile from the vaginal and rectal swabs matched defendant's DNA profile.

¶ 29    S.C. testified she was 18 years old in 2006. On May 5, 2006, after leaving a party, S.C. returned to her aunt's home at 646 E. 90th Street, where she was living at the time. According to S.C., neither her aunt nor her cousin answered the door, so she walked to the bus stop. At approximately 1 a.m., she telephoned a friend to obtain a number for a taxicab company, telephoned to request a cab and waited by the bus stop at 87th Street and Martin Luther King Drive.

¶ 30    S.C. also testified the taxicab did not arrive and she observed a black, four-door truck pull up and stop in proximity to her. S.C. described the truck as similar to a sports utility vehicle. S.C. testified a man she later identified as defendant exited the driver's side of the vehicle, approached her and asked whether she was waiting for a bus. According to S.C., defendant was wearing a red sleeveless jersey at the time and had tattoos on his arms.

¶ 31    S.C. further testified defendant grabbed her arm, put his other arm around her neck and forced her into the backseat of the truck with him. At this juncture, S.C. noticed another male occupied the driver's seat. S.C. pulled on the truck's door handle, but the door was locked. The second male drove the truck northward, then turned into an alley.

¶ 32    S.C. testified defendant ordered S.C. to remove her pants. S.C. pleaded with defendant not to hurt her, but defendant struck her head and choked her until she removed her pants. According to S.C., defendant also removed his pants and inserted his penis into her vagina as she pleaded for defendant to stop. The second male said, "Man, just let her go."

¶ 33    In addition, S.C. testified defendant forced her to perform oral sex on both defendant and the second male, whom defendant referred to as "Lee." Defendant also forced S.C. to give him a hug and a kiss before allowing her to get dressed and releasing her from the vehicle. Defendant also took her money. S.C. telephoned a friend, who came and escorted her to the University of Chicago Hospital, where a sexual assault kit was prepared. S.C. recalled speaking to Detective Connolly at the hospital. S.C. further testified that on January 23, 2008, she identified defendant as her assailant from a photo array Detective Connolly showed her.

¶ 34    After the State rested its case, defendant moved for a directed finding. The trial court denied the motion. Defendant rested without presenting evidence on his own behalf. Following closing arguments and jury instructions, the jury deliberated and found defendant guilty of one count of aggravated kidnaping and three counts of aggravated criminal sexual assault (involving penetration of penis to the mouth, vagina and anus).

¶ 35    On July 12, 2010, defendant filed a posttrial motion for a new trial. On July 27, 2010, the

trial judge heard and denied defendant's posttrial motion, then proceeded to a sentencing hearing. After hearing the evidence in aggravation and mitigation, the trial judge sentenced defendant to four consecutive 25-year terms in the Illinois Department of Corrections. Defendant apparently filed a motion to reconsider sentence, although the copy of this motion included in the record on appeal is undated. On August 26, 2010, the trial judge denied the motion to reconsider. Defendant filed a timely notice of appeal to this court on the same date.

¶ 36                                     DISCUSSION

¶ 37    On appeal, defendant argues: (1) the trial court erred in allowing the State to introduce "other crimes" evidence to show defendant's intent, motive and propensity to commit sex crimes; and (2) his constitutional right to confront the witnesses against him was violated by the admission of Qartaro's testimony without the testimony of other technicians involved in the DNA analysis in this case. We address the arguments in turn.

¶ 38                      The Admission of "Other Crimes" Evidence

¶ 39    Defendant maintains the trial court abused its discretion in admitting the evidence of the sexual assault on S.G. Under the common law, "other crimes" evidence generally is inadmissible if offered only to demonstrate the defendant's propensity to commit the charged crime. *People v. Donoho*, 204 Ill. 2d 159, 169 (2003). Evidence regarding other crimes generally is admissible if offered to prove intent, *modus operandi*, identity, motive, absence of mistake, or any relevant fact other than propensity. *Id*. at 170. In this case, the State sought to offer S.G.'s testimony to show not only intent and motive, but also defendant's propensity to commit sex crimes.

¶ 40    Section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2006)) provides an exception to the general rule in criminal cases, permitting evidence a defendant charged with aggravated criminal sexual assault has committed other sexual offenses to show the defendant's propensity to commit sex offenses. See *Donoho*, 204 Ill. 2d at 176. Like the common law, however, section 115-7.3 permits such evidence to be admitted only if: (1) it is relevant; and (2) its probative value is not outweighed by its prejudicial effect. *Id*. at 177-78. Section 115-7.3 further provides that, in weighing probative value against prejudicial effect, a court may consider: "(1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." 725 ILCS 5/115-7.3(c) (West 2006).

¶ 41    Trial courts should "be cautious in considering the admissibility of other-crimes evidence to show propensity by engaging in a meaningful assessment of the probative value versus the prejudicial impact of the evidence." *Donoho*, 204 Ill. 2d at 186. "When weighing the prejudicial effect of admission, a court should consider whether the other-crimes evidence will become the focus of the trial, or whether it might otherwise be misleading or confusing to the jury." *People v. Perez*, 2012 IL App (2d) 100865, ¶ 47. Nevertheless, a trial court's decision to admit "other crimes" evidence will not be reversed unless the court abused its discretion. *Donoho*, 204 Ill. 2d at 182. A trial court abuses its discretion if its determination is unreasonable, arbitrary, or fanciful, or if no reasonable person would adopt the court's

view. *Id.*

¶ 42     Defendant relies primarily upon *People v. Johnson*, 406 Ill. App. 3d 805, 811 (2010), in which this court ruled that although factual similarities will increase the probative value of such evidence, factual dissimilarities will increase the prejudicial effect.[2] The *Johnson* court ruled it was error (albeit harmless error) to admit "other crimes" evidence in that case, given the existence of significant dissimilarities between the two assaults, combined with the trial court's failure to conduct any sort of "meaningful" analysis of the prejudicial effect of the other-crimes evidence. *Id.* at 812. Defendant notes the other uncharged assault in *Johnson* was dissimilar from the charged offense insofar as it involved two assailants, the use of a vehicle, and nonidentical types of penetration. See *id.* at 807-08. Defendant thus argues *Johnson* is controlling here.

¶ 43     Defendant's analysis of *Johnson* is incomplete. The *Johnson* court noted those dissimilarities, but also noted in the other, uncharged offense, the victim testified defendant blew cocaine in her face and gave her alcohol during the assault, and anally penetrated her–two additional circumstances which differed from the assault testimony from the victim of the charged offenses. *Id.* at 811. This court also noted the similarities in *Johnson* were general in nature: (1) both victims were abducted while walking past alleys; (2) both victims were taken to an abandoned building before being assaulted; (3) the assailant used physical force and threatened to kill both victims if they did not comply with his demands; (4) defendant vaginally and orally penetrated both victims with his penis; and (5) both victims were adults when the assaults occurred–one victim was 42 years old and the other was 33 years old. *Id.*

¶ 44     This case lacks some of the dissimilarities found in *Johnson*. Moreover, the similarities here are stronger than in *Johnson*. For example, the offenses in this matter occurred within a three-week span of each other; in *Johnson*, one assault occurred on March 2, 2002, while the other did not occur until November 9, 2003. *Id.* at 806-07. The ages of the victims were also closer–17 and 18 years old–than those in *Johnson*. Although *Johnson* does not discuss the location of the assaults, the record shows the assaults here both occurred on the south side of Chicago. In *Johnson*, the charged assault occurred at 9:30 p.m., while the other occurred during the early evening at 5 p.m. *Id.* In contrast, both assaults in this case occurred in the early morning hours. In addition, both assaults in this case specifically involved defendant choking the victims and striking both in the head.

¶ 45     Furthermore, unlike *Johnson*, the transcript of the hearing on the State's motion in this case demonstrates the trial judge engaged in a meaningful analysis of both the similarities and dissimilarities between the two assaults in this case. The transcript indicates the trial

---

[2]Defendant also argues the assaults at issue here were less similar than those at issue in *Donoho*, *People v. Boand*, 362 Ill. App. 3d 106 (2005), and *People v. Boyd*, 366 Ill. App. 3d 84 (2006). Our supreme court has held "[w]here such evidence is not being offered under the *modus operandi* exception, 'mere general areas of similarity will suffice' to support admissibility." *Donoho*, 204 Ill. 2d at 184 (quoting *People v. Illgen*, 145 Ill. 2d 353, 372-73 (1991)). The existence of differences between the offenses does not necessarily defeat admissibility, as no two offenses are identical. *Donoho*, 204 Ill. 2d at 185 (citing *Illgen*, 145 Ill. 2d at 373).

judge decided to admit the evidence after "acknowledging there are some dissimilarities," particularly the number of assailants and the use of a car in the uncharged offense, in light of the similarities, particularly the proximity in time and location of the offenses. Given the record in this case, we conclude the trial court's ruling was not unreasonable, arbitrary, or fanciful, and a reasonable person could adopt the court's view. Accordingly, we conclude the trial court did not abuse its discretion in admitting the evidence of the assault on S.G. *Donoho*, 204 Ill. 2d at 182.[3]

¶ 46                                   Admission of the DNA Testimony

¶ 47        Lastly, defendant argues his constitutional right to confront the witnesses against him was violated where the trial court admitted Quartaro's testimony regarding Cellmark's DNA analysis, because Quartaro was not the technician who personally oversaw the robotic testing of the DNA samples at issue here. The sixth amendment's confrontation clause provides "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI. This part of the sixth amendment is known as the confrontation clause and applies to the states through the fourteenth amendment. *People v. Stechly*, 225 Ill. 2d 246, 264 (2007). The issue of whether defendant's sixth amendment confrontation rights were violated involves a question of law, which we review *de novo*. *People v. Lovejoy*, 235 Ill. 2d 97, 141-42 (2009).

¶ 48        In *Crawford v. Washington*, 541 U.S. 36, 68 (2004), the United States Supreme Court held the confrontation clause bars the admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination. The Court declined to specifically define what constitutes a "testimonial" statement, but gave some guidance on the question: "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations" *Id*. at 68. The *Crawford* Court further opined "[t]he [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id*. at 59 n.9.

¶ 49        In subsequent cases, the Court has further clarified. In *Davis v. Washington*, 547 U.S. 813, 822 (2006), the Court elaborated on what makes an out-of-court statement "testimonial," distinguishing between two types of statements that might be made to a police officer. One category of statement is nontestimonial; the other is testimonial:

        "Statements are nontestimonial when made in the course of police interrogation under

---

[3]Defendant claims the evidence was unfairly prejudicial, even if properly admitted, based on the State's closing argument. Defendant relies on *People v. Bedoya*, 325 Ill. App. 3d 926, 938 (2001), which did not involve evidence introduced to show propensity. The State, having properly sought the admission of this evidence to show propensity, was entitled to argue the point. The State is afforded a great deal of latitude in presenting closing argument and is entitled to argue all reasonable inferences from the evidence. See, *e.g.*, *People v. Nieves*, 193 Ill. 2d 513, 532-33 (2000). In addition, having found no abuse of discretion in admitting the testimony, this court need not address defendant's argument that the prejudice therefrom was not harmless error in this case.

circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.*

The *Davis* Court recognized this last clause–"that the purpose *** is to establish or prove past events potentially relevant to later criminal prosecution"–could apply to out-of-court statements not made during police interrogations. The Court limited its holding in this way because the statements at issue in *Davis* were made during police interrogations. In a footnote, however, the Court clarified it did not mean to "imply *** that statements made in the absence of any interrogation are necessarily nontestimonial." *Id*. at 822 n.1.

¶ 50     Justice Thomas objected to the majority's primary purpose test as unpredictable. *Id*. at 834 (Thomas, J., concurring in the judgment in part and dissenting in part). According to Justice Thomas, out-of-court statements that lack "some degree of solemnity" are not testimonial in nature. *Id*. at 836 (Thomas, J., concurring in the judgment in part and dissenting in part). He would find affidavits, depositions, prior testimony, and confessions sufficiently solemn "to constitute formalized statements" subject to the rule established by *Crawford*. *Id*. at 836-37 (Thomas, J., concurring in the judgment in part and dissenting in part).

¶ 51     Subsequently, the Supreme Court has issued varying opinions applying *Crawford* to the admission of forensic reports and testimony. In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), the issue was whether a certificate from a state laboratory attesting the substance analyzed was cocaine was testimonial hearsay when offered in evidence against a defendant charged with drug distribution and trafficking. The *Melendez-Diaz* Court, in a 5 to 4 decision, ruled the forensic analyst's certificates were within the "core class of testimonial statements" in *Crawford*. *Id*. at 310. The Supreme Court found "[t]he 'certificates' are functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.' " *Id*. at 310-11 (quoting *Davis v. Washington*, 547 U.S. 813, 830 (2006)). Indeed, under Massachusetts law, the sole purpose of the affidavit was evidentiary. *Melendez-Diaz*, 557 U.S. at 311. Accordingly, the Court concluded the introduction of the certificate in violation of the confrontation clause was error under *Crawford*. See *id*. at 329.

¶ 52     Two other aspects of *Melendez-Diaz* are particularly notable for the purpose of this appeal. First, the majority opinion noted in partial response to the dissent:

"[W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case. While the dissent is correct that '[i]t is the obligation of the prosecution to establish the chain of custody,' *post*, at [335], this does not mean that everyone who laid hands on the evidence must be called. As stated in the dissent's own quotation, *ibid*., from *United States v. Lott*, 854 F.2d 244, 250 (C.A.7 1988), 'gaps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility.' It is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony is

-11-

introduced must (if the defendant objects) be introduced live. Additionally, documents prepared in the regular course of equipment maintenance may well qualify as nontestimonial records." *Melendez-Diaz*, 557 U.S. at 311 n.1.

Second, Justice Thomas, a deciding vote, wrote a concurrence distancing himself from consideration of the purpose of the out-of-court statement and repeating his prior position that the confrontation clause is implicated only by extrajudicial statements " 'contained in formalized testimonial materials.' " *Id*. at 329 (Thomas, J., concurring) (quoting *White v. Illinois*, 502 U.S. 346, 365 (1992) (Thomas, J., concurring in part and concurring in the judgment, joined by Scalia, J.)).

¶ 53    In *Bullcoming v. New Mexico*, 564 U.S. ___, 131 S. Ct. 2705 (2011), the Supreme Court considered whether a defendant in a prosecution for driving while under the influence of intoxicating liquor had the right under the sixth amendment to confront the analyst who certified the blood-alcohol analysis report. *Id*. at ___, 131 S. Ct. at 2710. The prosecution had admitted the test results through the testimony of a scientist other than the one who performed the test. *Id*. at ___, 131 S. Ct. at 2709. The Court concluded the blood-alcohol test results were testimonial in nature because the report was "created solely for an 'evidentiary purpose' *** in aid of a police investigation." *Id*. at ___, 131 S. Ct. at 2717 (quoting *Melendez-Diaz*, 557 U.S. at 311). The absence of formal certification or notarization of the report did not remove it from the scope of the confrontation clause, because the formalities attending the creation of the report and its purpose were "more than adequate" to classify it as testimonial. *Id*. at ___, 131 S. Ct. at 2717.

¶ 54    Bullcoming, like *Melendez-Diaz*, produced a divided opinion. Justice Ginsburg wrote for the majority, but Justices Thomas and Kagan joined only in part. Notably, Justice Thomas did not join footnote 6 of the majority opinion, which again tied the question of whether a statement is testimonial to the "primary purpose" of the out-of-court statement. See *id*. at ___ n.6, 131 S. Ct. at 2714 n.6.

¶ 55    Moreover, Justice Sotomayor joined in part and filed a separate opinion concurring in part in *Bullcoming*. In her partial concurrence, Justice Sotomayor highlighted four facts not presented by the case, three of which are potentially relevant to this appeal. First, the person testifying was not "a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." *Id*. at ___, 131 S. Ct. at 2722 (Sotomayor, J., concurring in part). Second, the expert was not "asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence." *Id*. at ___, 131 S. Ct. at 2722 (Sotomayor, J., concurring in part). Third, *Bullcoming* was not a case "in which the State introduced only machine-generated results." *Id*. at ___, 131 S. Ct. at 2722 (Sotomayor, J., concurring in part).

¶ 56    In *Williams v. Illinois*, 567 U.S. ___, 132 S. Ct. 2221 (2012) (plurality op.), the Court considered whether the confrontation clause was violated by the admission of expert opinion testimony from a forensic DNA analyst from the Illinois State Police regarding DNA analysis performed by Cellmark. Justice Alito authored a plurality opinion, joined by Justices Roberts, Kennedy, and Breyer. These four justices were the dissenters in *Melendez-Diaz* and *Bullcoming*. The plurality concluded the expert's testimony was not barred, because

-12-

Cellmark's report could be a basis for the expert's opinion and the trial judge was presumed to have considered it for that purpose, not the truth of the matter asserted. See *Williams*, 567 U.S. at ___, 132 S. Ct. at 2240 (plurality op.).

¶ 57 The *Williams* plurality also independently concluded the admission of the actual DNA profile for its truth would not have violated the confrontation clause. *Id*. at ___, 132 S. Ct. at 2242 (plurality op.). The plurality noted that in all but one of the post-*Crawford* cases finding a confrontation violation, the abuses shared two characteristics: "(a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions." *Id*. at ___, 132 S. Ct. at 2242 (plurality op.). In *Davis v. Washington*, 547 U.S. 813, 829-32 (2006), an informal statement elicited in the course of the police interrogation was found to be testimonial in nature. However, in every case, including *Davis*, the "statement at issue had the primary purpose of accusing a targeted individual." *Williams*, 567 U.S. at ___, 132 S. Ct. at 2243 (plurality op.). "Thus, the plurality concluded in *Williams* that not all forensic reports offered by the State are testimonial statements." *People v. Leach*, 2012 IL 111534, ¶ 118.

¶ 58 Justice Thomas concurred in the judgment in *Williams* and "agree[d] with the plurality that the disclosure of Cellmark's out-of-court statements through the expert testimony *** did not violate the Confrontation Clause." *Williams*, 567 U.S. at ___, 132 S. Ct. at 2255 (Thomas, J., concurring in the judgment). He did not agree, however, with the plurality's rationale, instead reached his conclusion "solely because Cellmark's statements lacked the requisite 'formality and solemnity' to be considered ' "testimonial' " for purposes of the Confrontation Clause." *Williams*, 567 U.S. at ___, 132 S. Ct. at 2255 (Thomas, J., concurring in the judgment) (citing *Michigan v. Bryant*, 562 U.S. ___, ___, 131 S. Ct. 1143, 1167 (2011) (Thomas, J., concurring in the judgment)).

¶ 59 Justice Breyer authored a concurring opinion, writing he would have preferred reargument to address broader questions regarding the general application of the confrontation clause to crime laboratory reports and underlying technical statements. *Williams*, 567 U.S. at ___, 132 S. Ct. at 2244-45 (Breyer, J., concurring). One of Justice Breyer's concerns is relevant to this appeal:

> "[A]ssume that the admissibility of the initial laboratory report into trial had been directly at issue. Who should the prosecution have had to call to testify? Only the analyst who signed the report noting the match? What if the analyst who made the match knew nothing about either the laboratory's underlying procedures or the specific tests run in the particular case? Should the prosecution then have had to call all potentially involved laboratory technicians to testify? Six to twelve or more technicians could have been involved. (See Appendix, *infra*, which lists typically relevant laboratory procedures.) Some or all of the words spoken or written by each technician out of court might well have constituted relevant statements offered for their truth and reasonably relied on by a supervisor or analyst writing the laboratory report. Indeed, petitioner's *amici* argue that the technicians at each stage of the process should be subject to cross-examination." *Williams*, 567 U.S. at ___, 132 S. Ct. at 2246-47 (Breyer, J., concurring).

¶ 60 The dissenting opinion in *Williams*, authored by Justice Kagan, notes Breyer's concern: "He principally worries that *** a State will have to call to the witness stand '[s]ix to twelve or more technicians' who have worked on a report. See *ante*, at 2247; see also *ante*, at 2245-2246, 2253-2255. But none of our cases–including this one–has presented the question of how many analysts must testify about a given report. (That may suggest that in most cases a lead analyst is readily identifiable.) The problem in the cases–again, including this one–is that no analyst came forward to testify. In the event that some future case presents the multiple-technician issue, the Court can focus on 'the broader "limits" question' that troubles Justice BREYER, *ante*, at 2248. But the mere existence of that question is no reason to wrongly decide the case before us–which, it bears repeating, involved the testimony of not twelve or six or three or one, but zero Cellmark analysts." (Emphasis omitted.) *Williams*, 567 U.S. at ___ n.4, 132 S. Ct. at 2273 n.4 (Kagan, J., dissenting, joined by Scalia, Ginsburg and Sotomayor, JJ.).

¶ 61 Elsewhere, in arguing the case is controlled by precedent, the *Williams* dissent asserts: " '[W]hen the State elected to introduce' the substance of Cellmark's report into evidence, the analyst who generated that report 'became a witness' whom Williams 'had the right to confront.' " *Williams*, 567 U.S. at ___, 132 S. Ct. at 2268 (Kagan, J., dissenting, joined by Scalia, Ginsburg and Sotomayor, JJ.) (quoting *Bullcoming*, 564 U.S. at ___, 131 S. Ct. at 2716).

According to the dissent, under the Court's prior analysis, "the substance of the report could come into evidence only if Williams had a chance to cross-examine the responsible analyst." *Williams*, 567 U.S. at ___, 132 S. Ct. at 2267 (Kagan, J., dissenting, joined by Scalia, Ginsburg and Sotomayor, JJ.). The dissent also criticized the majority's formulation in examining the purpose for which the statement was made, noting *Melendez-Diaz* and *Bullcoming* merely asked whether the statement was made for the purpose of providing evidence. *Williams*, 567 U.S. at ___, 132 S. Ct. at 2273-74 (Kagan, J., dissenting, joined by Scalia, Ginsburg and Sotomayor, JJ.).

¶ 62 The State argues *Williams* is controlling in this case. Defendant argues *Williams* is distinguishable because that case involved a bench trial, whereas this case is an appeal from a jury trial. Defendant also argues the fractured opinion in *Williams* is not controlling on the law and urges this court to rule in his favor based on *Melendez-Diaz* and *Bullcoming*.

¶ 63 Neither party is entirely correct. Granted, the first portion of the *Williams* plurality opinion does distinguish between bench trials and jury trials. For example, the *Williams* plurality notes the rules of evidence in federal and Illinois courts typically bar admission of the facts and data underlying expert opinions in jury trials. *Williams*, 567 U.S. at ___, 132 S. Ct. at 2234-35 (plurality op.). The plurality also acknowledges the dissent "would have force" in the context of a jury trial, where, "[a]bsent an evaluation of the risk of juror confusion and careful jury instructions, the testimony could not have gone to the jury." *Williams*, 567 U.S. at ___, 132 S. Ct. at 2236 (plurality op.). In contrast, in a bench trial, it is presumed the trial judge, as the trier of fact, understood the contested portions of the expert testimony were not admissible to prove the truth of the matter asserted. *Williams*, 567 U.S. at ___, 132 S. Ct. at 2236-37 (plurality op.).

¶ 64     Nevertheless, the second, independent portion of the *Williams* plurality opinion does not depend on the difference between a bench trial and a jury trial. Rather, as the Illinois Supreme Court notes in *Leach* (which involved the application of *Williams* to the admissibility of an autopsy report), the second, independent portion of *Williams* establishes that not all forensic reports offered by the State are testimonial. See *Leach*, 2012 IL 111534, ¶ 118. This was also Justice Thomas's conclusion, although he disagreed with the plurality regarding the reason Cellmark's report was not testimonial. *Williams*, 567 U.S. at ___, 132 S. Ct. at 2255 (Thomas, J., concurring in the judgment). Accordingly, assuming, *arguendo*, that Quartaro's testimony was based in part on out-of-court statements, there would still be no violation of the confrontation clause. See *People v. Negron*, 2012 IL App (1st) 101194, ¶ 48 ("We glean the central holding of *Williams* from the narrow grounds on which Justice Thomas agreed with the plurality.").[4]

¶ 65     Moreover, our conclusion would be the same absent *Williams*. The testifying expert in this case is a Cellmark supervisor. Defendant argues the State was required to present testimony from the technician who loaded the DNA samples onto the robotic instrumentation and oversaw the testing in the wet chemistry lab. Thus, this case involves the question adverted to but not technically before the *Williams* Court regarding the number of analysts the State must call to satisfy the confrontation clause.

¶ 66     Even prior to the Supreme Court's decision in *Williams*, this court expressed skepticism of the idea the confrontation clause "would require each and every individual involved in the testing and analysis of DNA to testify at trial," where the testifying expert was a Cellmark representative who performed an independent review of the analysts' work. *Johnson*, 406 Ill. App. 3d at 818 (*dicta*).[5] Post-*Williams*, we find *State v. Lopez*, 45 A.3d 1 (R.I. 2012), persuasive on this issue. In *Lopez*, "Matthew Quartaro, a supervisor at Cellmark, testified as an expert witness on behalf of the state regarding the results of the DNA testing." *Lopez*, 45 A.3d at 10. At trial:

"Quartaro testified that he did not personally observe the analysts who conducted the cutting, extraction, or quantification, nor did he perform those steps. In fact, Quartaro indicated that he never physically touched the evidence in this case. Despite this, he testified that he had been 'involved in the entire process' by other means. Specifically,

---

[4]In his reply brief and a motion to cite supplemental authority, defendant cites cases from other states and federal courts discounting the *Williams* plurality opinion and relying on *Melendez-Diaz* and *Bullcoming*. In light of *Leach* and *Negron*, we find the authorities defendant cites unpersuasive.

[5]The *Johnson* court ruled the testimony admissible on the ground it was not introduced to prove the truth of Cellmark's findings. *Johnson*, 406 Ill. App. 3d at 818. Subsequently, a majority of the United States Supreme Court indicated a likely disagreement with that particular conclusion. *Williams*, 567 U.S. at ___, 132 S. Ct. at 2256 (Thomas, J., concurring in the judgment); *id*. at ___, 132 S. Ct. at 2268 (Kagan, J., dissenting, joined by Scalia, Ginsburg and Sotomayor, JJ.). However, as noted earlier, the issue of the number of analysts constitutionally required to testify in a case like this one was not squarely at issue in *Williams*.

Quartaro explained that he 'evaluate[d] all the profiles, ma[d]e sure that *** the best possible profile [s] [were obtained] from the evidence[,] *** compared all the profiles, drew conclusions on those, calculate[d] statistics, [and] prepared [a] report.' The only portion of Quartaro's report admitted into evidence was an allele table, which presented the numerical-DNA profile of each of the seven samples tested. Quartaro testified that he prepared this chart based on his analysis of computer-generated graphs, which consisted of 'raw data' obtained from the PCR-testing stage. Quartaro's report and conclusions then were reviewed by another analyst at Cellmark, Kelli Byrd." *Id*. at 10-11.

In *Lopez*, as in this case, the defendant argued such testimony violated his sixth amendment right to confront the analysts who conducted the preliminary stages of the DNA testing. The Supreme Court of Rhode Island distinguished the case from *Bullcoming* on the basis Quartaro did not act as a surrogate witness because he was "integrally involved" in the process of the DNA testing. *Id*. at 13. Acting as a Cellmark supervisor, he directed the DNA testing, reviewed the case file, ensured the proper protocols were observed, personally reviewed and analyzed the raw data and articulated his own conclusions. *Id*. at 13

¶ 67    The *Lopez* court acknowledged cross-examination of Quartaro did not necessarily address every possibility of bias or error in the DNA testing. *Id*. at 16. Nevertheless:

"[t]he Supreme Court made it clear that the Confrontation Clause does not mandate 'that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case.' " *Id*. (quoting *Melendez-Diaz*, 557 U.S. at 311 n.1).

Accordingly, the *Lopez* court concluded the fact that Quartaro used data from the work of his analysts "did not bestow upon defendant the constitutional right to confront each and every one of those subordinate analysts." *Id*. The court held:

"[W]here defendant had ample opportunity to confront Quartaro–the witness who undertook the critical stage of the DNA analysis, supervised over and had personal knowledge of the protocols and process of all stages involved in the DNA testing, reviewed the notes and data produced by all previous analysts, and testified to the controls employed by the testing lab to safeguard against the possibility of testing errors–the Confrontation Clause was satisfied." *Id*.

Other courts similarly reject the argument that the confrontation clause requires testimony from every person involved in performing a forensic DNA analysis. *E.g.*, *Aguilar v. Commonwealth*, 699 S.E.2d 215, 222 (Va. 2010); *Vann v. State*, 229 P.3d 197, 210-11 (Alaska Ct. App. 2010); *United States v. Boyd*, 686 F. Supp. 2d 382, 385 (S.D.N.Y. 2010), *aff'd*, 401 F. App'x 565 (2d Cir. 2010).

¶ 68    In this case, Quartaro was more involved in the DNA testing process than the expert in *Lopez*, as he took the cuttings to send to DNA testing in the first instance. Moreover, similar to *Lopez*, Quartaro independently reviewed the data and documentation in this case, performed the analysis on the data, and authored the report for Cellmark. Furthermore, Quartaro described the controls Cellmark used and testified the proper controls were run in this case to ensure the instruments were functioning properly. Indeed, in this case Quartaro testified the chain of custody was maintained as to all of the samples. What remains are

-16-

potential questions regarding the authenticity of the sample, which normally goes to the weight of the evidence rather than its admissibility. See *Melendez-Diaz*, 557 U.S. at 311 n.1. Accordingly, even assuming, *arguendo*, that *Williams* was not applicable to this case, defendant's argument fails.

¶ 69    Defendant raises two related subissues in passing in his brief. First, defendant complains in a single sentence, without citation to authority, that the State introduced a chart illustrating the results of Cellmark's testing. The record on appeal indicates the exhibit at issue was used during testimony of Tomek, not Quartaro. The transcript of Tomek's testimony indicates defense counsel raised "no objection" to the use of the chart. The record on appeal contains no written response to the State's motion *in limine* to admit Quartaro's testimony; the transcript of the hearing on the motion contains no objection referring to the chart. Tomek's use of the chart was not raised as a grounds for a new trial in defendant's posttrial motion. Accordingly, this issue is forfeited because defendant failed to raise it at trial or in his motion for a new trial. *People v. Woods*, 214 Ill. 2d 455, 470 (2005); *People v. Eastling*, 386 Ill. App. 3d 884, 887-88 (2008). Furthermore, in instances of forfeiture, it is defendant's burden to establish plain error and "when a defendant fails to present an argument on how either of the two prongs of the plain-error doctrine is satisfied, he forfeits plain-error review." *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010). Indeed, our supreme court has admonished this court to consider constitutional questions only where the case cannot be determined on other grounds. *People v. White*, 2011 IL 109689, ¶ 148 (and cases cited therein). Thus, we decline to relax the forfeiture rule in this case.[6]

---

[6]The special concurrence takes exception with our discussion of defendant's forfeiture of these issues and suggests the majority has mischaracterized defendant's comment about the introduction of the chart of DNA test results. The special concurrence alludes to two paragraphs of defendant's brief, in which the chart is mentioned precisely once, in passing, in a single sentence on page 18 of the brief. That sentence states, "As in *Bullcoming*, merely presenting the testimony of Quartaro and a chart showing results of the DNA testing, and not the actual Cellmark analyst who performed the testing, failed to provide the defense the required opportunity to ' expose *** lapses or lies on [the analyst's] part.' "

The special concurrence asserts the exhibit at issue related to the testimony from both Tomek and Quartaro, but the record indicates the chart was used by Tomek. The issue of the introduction and use of the chart is a complex and significantly different question from the issue of Quartaro's testimony in general. Compare *Lopez*, 45 A.3d at 12-16, with *id*. at 16-20. In this case, an analysis of the issue would be further complicated by the fact the chart was used by Tomek, not Quartaro. The issues raised by Tomek's testimony relying on Cellmark's work is not necessarily identical to the issues raise by Quartaro's testimony regarding the work performed by Quaratro and his subordinates. The two paragraphs from defendant's brief which the special concurrence refers to do not address these issues. The special concurrence suggests the burden was on the State to argue the chart raises different issues. We disagree, as defendant mentions the chart in one sentence and defendant's legal authority does not address the issues raised by the chart.

Moreover, defendant did not object to the admission of the chart at trial or in his posttrial motion. As our supreme court instructs us, one of the most important functions of the appellate court is to determine whether an issue has been forfeited, so as to avoid unnecessary expenditure of

-17-

¶ 70    Second, defendant maintains Quartaro improperly bolstered his testimony by volunteering on cross-examination, in response to the question of whether Bird merely summarized what transpired at Cellmark regarding this case, that Bird reviewed his report and agreed with its conclusion. Similar to defendant's first passing objection, the trial transcript indicates defense counsel did not object to the testimony or move to strike it. Defendant raised the issue of Quartaro's testimony about aspects of the DNA testing process in his posttrial motion, but did not specifically challenge his testimony about Bird on either constitutional or ordinary evidentiary grounds. In general, "a defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." *Woods*, 214 Ill. 2d at 470. In addition, defendant did not request plain-error review, thereby forfeiting it. *Hillier*, 237 Ill. 2d at 545-46. Thus, for the reasons already stated, we decline to relax the rule of forfeiture. See *White*, 2011 IL 109689, ¶ 148.

¶ 71                              CONCLUSION

¶ 72    In sum, we conclude the trial court did not abuse its discretion in admitting "other crimes" evidence in this case. We also conclude defendant failed to show the admission of Quartaro's testimony violated his sixth amendment right to confront the witnesses against him, because the confrontation clause did not require the State to produce other Cellmark technicians to testify regarding the preliminary steps in the DNA analysis prepared by Quartaro. Defendant forfeited his other objections to the expert testimony in this case. For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 73    Affirmed.

¶ 74    JUSTICE GORDON, specially concurring.

¶ 75    I agree with the majority's disposition of the case, but write separately to clarify three points.

¶ 76    First, in paragraphs 69 and 70, the majority states that defendant waived consideration of two "subissues" by not requesting plain-error review. However, although the State discussed generally the larger confrontation clause issue, it did not assert in its appellate brief that defendant forfeited these issues by failing to raise them in the trial court or in a posttrial

---

judicial resources. *People v. Smith*, 228 Ill. 2d 95, 106 (2008). Therefore, this court should not refrain or deviate from fulfilling this function as set forth by our supreme court simply because the State fails to mention the issue. Indeed, our supreme court has "repeatedly cited the general principle that courts will address constitutional issues only as a last resort, relying whenever possible on nonconstitutional grounds to decide cases." *People v. Jackson*, 2013 IL 113986, ¶ 14 (and cases cited therein). In this case, the complex and unsettled constitutional issue regarding the chart need not be addressed, given our long-established and uncontroversial rules of forfeiture.

motion, and thus, the State forfeited its right to claim waiver on this ground. *People v. De La Paz*, 204 Ill. 2d 426, 433 (2003) ("It is well established that the State may waive waiver."); *People v. Lacy*, 407 Ill. App. 3d 442, 461 (2011).

¶ 77    For example, in *People v. Hillier*, 237 Ill. 2d 539, 546 (2010), the defendant argued to our supreme court "that the State forfeited its forfeiture argument by failing to raise it in the appellate court." In response, the State "filed copies of the appellate court briefs with [our supreme] court to establish that it did indeed argue forfeiture in the appellate court." *Hillier*, 237 Ill. 2d at 546 n.3. The defendant then conceded this point at the oral argument before our supreme court. *Hillier*, 237 Ill. 2d at 546 n.3. Since the State had, in fact, raised the issue of forfeiture in its appellate brief, our supreme court held that the defense had failed to meet its burden of establishing plain error by failing to argue it in its subsequent brief. *Hillier*, 237 Ill. 2d at 545-46.

¶ 78    In contrast to *Hillier*, the State in the case at bar did, in fact, forfeit forfeiture by failing to argue in its appellate brief that defendant had failed to assert these issues either in the trial court or in a posttrial motion. As a result, the majority should have addressed these issues under a harmless-error review in its analysis. However, since I believe that the outcome would be the same under either harmless-error or plain-error review, I specially concur.

¶ 79    The majority writes: "The special concurrence suggests the burden was on the State to argue the chart raises different issues." *Supra* ¶ 69 n.6. I do not understand this sentence in the context of my special concurrence. What I have stated, quite simply, is that the State waived the issue of forfeiture.

¶ 80    Second, the majority writes: "defendant complains in a single sentence, without citation to authority, that the State introduced a chart illustrating the results of Cellmark's testing." *Supra* ¶ 69. This statement is factually incorrect. Defendant's brief contains a two-paragraph, full-page discussion concerning the chart, including a discussion of the United States Supreme Court's decision in *Bullcoming v. New Mexico*, 564 U.S. ___, 131 S. Ct. 2705 (2011). The first sentence of the first paragraph is a thesis sentence, introducing defendant's discussion of how "the chart" and Quartaro's testimony raised the same issues "[a]s in *Bullcoming*." The first sentence, or thesis sentence, of the second paragraph continues this discussion referring back to "the DNA evidence," which includes the DNA evidence named in the immediately preceding paragraph: the chart and Quartaro's testimony. Thus, any suggestion that defendant forfeited this claim by failing to provide reasoned legal argument or citation to relevant authority would be incorrect and misplaced. *Supra* ¶ 69 n.6.

¶ 81    The majority asserts that the chart relates only to Tomek's testimony but not to Quartaro's testimony. *Supra* ¶ 69 n.6. It relates to both. At trial, Quataro testified that he supervised a team of eight DNA analysts at the Cellmark laboratory and that he authored Cellmark's report. However, he admitted that he did not oversee the tests used in this case. Then Tomek, who is employed by the Illinois State Police, used the chart, which illustrated the results of tests done by both Cellmark and the Illinois State Police crime lab, in order to offer his opinion that defendant's DNA profile matched the DNA profile generated by the Cellmark lab. Quartaro's testimony laid the foundation for the information in the chart that defendant now challenges on appeal. Thus, on the facts and arguments made before us, the

issues related to the chart are not significantly different from the issues related to Quartaro's testimony.

¶ 82    The majority cites *State v. Lopez*, 45 A.3d 1, 12-16 (R.I. 2012), for the proposition that the "use of the chart is a complex and significantly different question from the issue of Quartaro's testimony in general." *Supra* ¶ 69 n.6. In *Lopez*, the Rhode Island Supreme Court considered whether an allele table contained "mere machine-generated" data and was thus nontestimonial. *Lopez*, 45 A.3d at 17. In the case at bar, the State has not raised this argument and thus, it is not before us.

¶ 83    In addition, I specially concur on another issue that I believe the majority handled improperly. The State argues to this court in its appellate brief that defendant's confrontation rights were fully satisfied by his opportunity to cross-examine the DNA supervisor, and cites in support *Bullcoming v. New Mexico*, 564 U.S. ___, 131 S. Ct. 2705 (2011). I agree.

¶ 84    On appeal, defendant does not suggest any questions that he would have asked the nontestifying DNA analysts and that he could not have asked their supervisor. By contrast, the United States Supreme Court found a confrontation clause violation in *Bullcoming v. New Mexico*, 564 U.S. ___, ___, 131 S. Ct. 2705, 2715 (2011), stating: "Significant here, Razatos had no knowledge of the reason why Caylor had been placed on unpaid leave. With Caylor on the stand, Bullcoming's counsel could have asked questions designed to reveal whether incompetence, evasiveness, or dishonesty accounted for Caylor's removal from his work station." By contrast, in the case at bar, defendant does not identify any questions that he could not pose to the supervisor and that only the analysts could answer. The majority does not discuss this issue in its decision.

¶ 85    For the foregoing reasons, I specially concur.