NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (4th) 190446-U

NO. 4-19-0446

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 28, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Vermilion County |
| JOSEPH S. JOHNSON, | ) | No. 16CF396 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Nancy S. Fahey, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Turner and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) By admitting evidence of uncharged crimes, the circuit court did not abuse its discretion.

(2) Defense counsel had a possible strategic reason for refraining from objecting to hearsay testimony by a sexual assault nurse examiner, and a reviewing court should defer to such strategic decisions.

(3) In a trial for predatory criminal sexual assault of a child, it is permissible to use the word "rape" and derivatives of that word.

(4) In the circumstances of this case, it was no abuse of discretion to impose the maximum sentence of imprisonment for predatory criminal sexual assault of a child.

¶ 2    The State charged that, in approximately March 2016, defendant, Joseph S. Johnson, committed predatory criminal sexual assault of a child (720 1LCS 5/11-1.40(a)(1) (West 2016)) by perpetrating upon A.J., a child under the age of 13 years, "an act of sexual penetration."

A jury found defendant guilty, and the circuit court of Vermilion County sentenced him to imprisonment for 60 years. Defendant appeals on five grounds.

¶ 3        First, defendant contends that the circuit court abused its discretion by admitting evidence that he committed crimes in addition to the crime with which he was charged. We conclude that this evidence of other crimes was statutorily authorized, and we find no abuse of discretion in its admission in the jury trial.

¶ 4        Second, defendant argues that his defense counsel rendered ineffective assistance by neglecting to object to hearsay testimony by a sexual assault nurse examiner. We infer a possible strategic reason for refraining from objecting. We defer to that strategy.

¶ 5        Third, defendant argues that his defense counsel also rendered ineffective assistance by failing to object when, in the jury trial, the prosecutor used the word "rape" and derivatives of that word. Under statutory law, however, such an objection would have been unsound. Refraining from unmeritorious objections is not ineffective assistance.

¶ 6        Fourth, defendant challenges the sentence of 60 years' imprisonment as excessive. In the circumstances of this case, we are unable to characterize this maximum sentence as an abuse of discretion.

¶ 7        Therefore, we affirm the judgment.

¶ 8                              I. BACKGROUND

¶ 9                             A. Pretrial Motions

¶ 10                    1. *The Admission of Out-of-Court Statements*

                        *by A.J. to Her Mother and to an Investigator*

¶ 11        A statement is hearsay if (1) the declarant, that is, the maker of the statement, made the statement other than while testifying in the trial or hearing and (2) the statement is offered in

evidence to prove the truth of what the statement represents. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Hearsay is inadmissible as evidence except insomuch as a supreme court rule or a statute provides otherwise. Ill. R. Evid. 802 (eff. Jan. 1, 2011).

¶ 12        Section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2018)) creates a hearsay exception for out-of-court statements made by persons who were under the age of 13 when a sex offense was perpetrated upon them. Certain conditions must hold true for this exception to be applicable. See *id.* § 115-10(b). We need not go into all the statutory conditions, but one condition is a judicial finding, "in a hearing conducted outside the presence of the jury[,] that the time, content, and circumstances of the statement provide sufficient safeguards of reliability." *Id.* § 115-10(b)(1). If all the statutory conditions, including that one, are fulfilled "the following evidence shall be admitted as an exception to the hearsay rule":

> "(1) testimony by the victim of an out of court statement made by the victim that he or she complained of such act to another; and
>
> (2) testimony of an out of court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against that victim." *Id.* § 115-10(a)(1), (2).

Thus, section 115-10 would allow not only the victim but also other witnesses to testify to the victim's out-of-court statements.

¶ 13        In a pretrial hearing pursuant to section 115-10(b)(1), the circuit court ruled that out-of-court statements that A.J. had made to her mother, Melanie D., and to an investigator with the Vermilion County sheriff's department, Sean Jones, were reliable enough to be admissible in the jury trial.

¶ 14    2. *The Admission of Evidence That Defendant Committed*

*Additional, Uncharged Crimes Against A.J. and Another Girl, T.H.*

¶ 15    Generally, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Ill. R. Evid. 404(a) (eff. Jan. 1, 2011). In other words, as a general rule, the State may not prove that the defendant committed crimes other than the crime alleged in the charge if the purpose of such proof is to suggest that the defendant has a propensity to commit crime and that the defendant, therefore, consistent with that propensity, must have committed the charged crime. As with the rule against hearsay, however, there are statutory exceptions to this rule against propensity evidence. The Illinois rule of evidence from which we quoted at the beginning of this paragraph explicitly recognizes the statutory exceptions. See Ill. R. Evid. 404(3)(b) (eff. Jan. 1, 2011).

¶ 16    One statutory exception to the ban on propensity evidence is in section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2016)). Under that section, if the defendant is charged with a sex offense, propensity evidence is admissible against the defendant provided that (1) the evidence is otherwise admissible under the rules of evidence (*id.* § 115-7.3(b)) and (2) the circuit court approves the admission of the propensity evidence after weighing its probative value against the danger of undue prejudice to the defendant (*id.* § 115-7.3(c)).

¶ 17    In a pretrial hearing pursuant to section 115-7.3(c), the circuit court decided that evidence of defendant's commission of other, uncharged crimes against A.J. and another girl, T.H., was probative enough to be admissible in the jury trial. (By "other" crimes, we mean instances of misbehavior by defendant other than the instance alleged in the "information," otherwise known as the charging instrument.)

¶ 18        3. *The Admission of A.J.'s Hearsay Statements to a Sexual Assault Nurse Examiner*

¶ 19        Section 115-13 of the Code of Criminal Procedure of 1963 (*id.* § 115-13) creates a hearsay exception for statements that victims of sex offenses make to medical personnel "for purposes of medical diagnosis or treatment." In a pretrial hearing, the circuit court ruled that statements that A.J. had made to a sexual assault nurse examiner, Lisa Moment, would be admissible under this statute.

¶ 20        4. *The Use of the Words "Rape," "Rapist," and "Raping"*

¶ 21        Before the trial, defense counsel filed a motion *in limine* requesting, among other things, that the circuit court prohibit the State from using the words "rape," "rapist," and "raping" before the jury. (A motion *in limine* (Latin for "on the threshold") is "[a] pretrial request that certain inadmissible evidence not be referred to or offered at trial." Black's Law Dictionary (11th ed. 2019) (definition of "motion *in limine*").) Receiving no objection from the prosecutor, the court granted the request. The State was forbidden to use the words "rape," "rapist," and "raping" before the jury.

¶ 22        B. The Jury Trial (January 2019)

¶ 23        1. *The Testimony of Melanie D.*

¶ 24        Melanie D. (the mother) testified that she used to be married to defendant, who was now 33 or 34 years old, and that A.J., born on May 3, 2005, was their daughter. In 2007, the mother and defendant divorced. Ever since the divorce, the mother's relationship with defendant had been noncontentious and, lately, even somewhat cordial as they conferred together and collaborated on raising A.J. By court order, the mother had primary custody of A.J., and defendant had A.J. for visitation every other weekend. The final visitation, as it turned out, was Friday, April 1, 2016, to Sunday, April 3, 2016.

¶ 25　　　　　On April 13, 2016, the mother; A.J.; the mother's boyfriend, Chad Jumps; and his son, Michael Elmore, were having dinner together at a restaurant. They were sitting in a booth. A.J., who, according to the mother's testimony, had attention deficit hyperactivity disorder, started getting "riled up" and unruly. The mother warned her, "['S]traighten up or I'm going to tell your dad you're acting up.[']" That warning struck fear into A.J. The terror was evident in her demeanor. A.J. began weeping. She pleaded, "['N]o, mommy, please don't. I can't take it anymore.[']" The mother asked her why she was reacting that way. A.J. answered, "['H]e'll make me suck.[']" "[']He'll make you suck what[?']" the mother asked. A.J., who was sitting directly across the table from her, then leaned forward as if to prevent anyone else from hearing her, and she answered, "['H]is thing.[']" The mother asked her what she meant by "[']his thing.[']" A.J. answered, "['H]is middle parts[']."

¶ 26　　　　　The mother had A.J. get up from the table and accompany her into the women's bathroom. A.J. was still weeping and trembling. In the bathroom, they had this further conversation (we quote from the mother's testimony):

> "A. *** I asked her[,] ['T]his is the truth[?] [T]his—this is important, we're going to have to call the police.['] I asked her what else had happened. *** And I asked her if he did anything in the front[,] and she said he just touched her there.
>
> Q. Now, in the bathroom did you ask her when this happened?
>
> A. Yes.
>
> Q. And what did she say?
>
> A. She didn't have an exact time.
>
> Q. Did you ask her how—if it only happened once or how many times?
>
> A. Yes.

Q. And what did she say?

A. She said it had happened several times over the last several years."

¶ 27 The mother and A.J. went home from the restaurant, and the mother called the police.

¶ 28                                    2. *The Testimony of Sean Jones*

¶ 29 On April 15 and June 10, 2016, an investigator with the Vermilion County sheriff's department, Sean Jones, interviewed 11-year-old A.J., endeavoring to ask her open-ended questions and follow-up questions as well. People's exhibit No. 1 was a compact disc containing audiovisual recordings of the interviews.

¶ 30 Jones asked A.J. if she knew why she was being interviewed. She answered that it was because of what her father had done to her. Ever since she was seven years old, her father had been "molest[ing]" her "[b]y making [her] suck on his middle part and [by] sticking it in [her] bottom." Jones asked A.J. what she meant by "middle part." She answered that she meant her father's "weenie." When taking her out ostensibly to chop firewood, her father had made her "[']suck his weenie.[']" In conversations with others, such as the mother, defendant had represented that he would take A.J. to a campsite to chop wood as punishment after she misbehaved. But going to the campsite was a ruse:

> "[A.J.] said that her father would take her to what she referred to as a camp site to chop wood, or at least that's what he would tell others, but she advised that she wouldn't chop wood. He would in fact punish her or make her perform a sexual act."

Typically, the sexual act was fellatio, and when defendant ejaculated, he would make her swallow.

¶ 31    The incitement for the punitive sex could be trivial. For instance, one time A.J. was idly playing with a light bulb, unscrewing it from the socket and screwing it back in. Defendant became angry and ordered a trip to the campsite for some "wood-chopping."

¶ 32    According to A.J., defendant once became so enraged with her that he gripped her violently by the neck. Jones testified: "She advised that he would essentially choke her with one hand, in which she was suspended off the ground against the wall and made a comment to the effect of he could snap her neck and had his hand bent at an angle." A.J. recounted this choking incident in Jones's first interview of her.

¶ 33    The prosecutor asked Jones if he thought that, in the two interviews, A.J. used language consistent with her age. Jones answered that he thought her vocabulary was consistent with her age except that she used sexual terminology that "was beyond her age and maturity." This precocity in sexual vocabulary did not lead Jones to doubt that A.J. was telling the truth. Rather, it seemed to him an indication that she was "involved in some type of sexual environment." For instance, she used the term "[s]ixty-nine." When Jones asked her what she meant by that term, she described how "the two participants would be positioned." The prosecutor asked Jones:

> "Q. And was that in the context of something her father had described or engaged in?
>
> A. I believe she advised it was something that her father had wanted her to perform with [T.H.]
>
> Q. And who is [T.H.]?
>
> A. [T.H.] was a daughter, I believe, of a young lady [whom defendant] was dating at the time."

¶ 34    3. *The Testimony of A.J.*

¶ 35        A.J. testified that she now was almost 14 years old and that she lived in Westville,

Illinois, with her mother, her stepfather, and her stepbrother. Defendant was her father, but she

could not remember his ever living with her mother. He now lived in a trailer in Westville, Illinois.

As she was growing up, she used to go to his residence every other weekend.

¶ 36        In April 2016, in a restaurant, A.J. told her mother, Melanie D., that she did not

want to go to defendant's anymore. The thought of having to go to his place again caused A.J. to

be "[overcome] with fear." She was afraid that he would "molest" her yet again, as he had done

"[j]ust two weeks before" this conversation in the restaurant.

¶ 37        The prosecutor asked A.J. what "body parts" were involved in these molestations.

A.J. answered that it involved her "bottom and mouth" and defendant's "middle parts." The

prosecutor continued:

> "Q. Is there a name for middle parts that you would have maybe learned in
>
> school?
>
> A. Yes.
>
> Q. And what word is that?
>
> A. I do not feel comfortable saying it out loud.
>
> Q. Can you please spell it for us[?]
>
> * * *
>
> A. P-E-N-I-S."

¶ 38        The last and final time when defendant touched her with his penis was two weeks

before A.J.'s anxiety attack in the restaurant. The two of them, defendant and A.J., had walked to

a private campsite. The campsite was about a mile from defendant's trailer in Georgetown. (At

that time, he lived in Georgetown with his then-girlfriend, Amanda H.) Trees shielded the campsite

from view, and nothing was there except a tent. A.J. had been with defendant to this campsite before. The ostensible reason for their going there this time was that A.J. "had messed with something"—"[a] light"—that she "[should not] have messed with."

¶ 39 When the two of them arrived at the campsite, defendant "stuck his middle parts in [A.J.'s] mouth." The prosecutor asked A.J. questions that required her to become specific and descriptive about the compelled act of oral penetration. Before defendant put it in her mouth, his penis, as A.J. described it, looked like "something *** covered in skin." When he put it in her mouth, it felt at first like "[s]oggy waffles." Then it changed, becoming "stiffer and harder." "How long did this last?" the prosecutor asked. "Four years that I can remember," A.J. answered. "This particular time," the prosecutor clarified, "how long did he have that in your mouth?" "Until he was done," she answered. The prosecutor asked her if defendant said anything to let her know that he was done. She answered, "He said it was coming." Then, from a feeling of "thick" "[w]armth" in her mouth, she knew that he was finished. He withdrew his penis from her mouth and gave her the hatchet that he had brought from his trailer. After she chopped on some wood for a while—or, on his instructions, roughed up the bark for appearances' sake—they walked back to his trailer. Upon their return, A.J. told no one what defendant had done to her.

¶ 40 At this point in A.J.'s testimony, at the prosecutor's request, the circuit court read to the jury the following limiting instruction on uncharged crimes:

> "Jurors, evidence is about to be received that the defendant has been involved in conduct other than that charged in the Information. This evidence has been received on the issues of defendant's intent, motive, propensity to commit sex offenses and course of conduct and may be considered by you for any relevant purpose. It is for you to determine whether the defendant was involved in that

conduct and if so what weight should be given to this evidence for any relevant purpose."

¶ 41　　A.J. resumed her testimony. She testified that "something like that had happened" "[a]t least every time [she] went" to visit defendant. Both at the campsite and at the trailer, defendant touched her bottom with "[h]is middle parts" (but he did not touch her bottom as often as he had her perform fellatio on him). When he touched her bottom with his "middle parts," her "face would be down, [her] arms would be touching the ground[,] and [her] knees [would be] on the ground." Defendant would be behind her, moving his body "forwards and backwards." This would be physically "[p]ainful" for her. Also, sometimes, he touched her "middle parts." She did not "feel comfortable saying *** out loud" or even spelling what she meant by her own "middle parts." In terms, though, of going to the restroom, they were "[n]umber one" as opposed to "number two." Once, he put his middle parts in her mouth while they were alone in the bedroom of his trailer.

¶ 42　　The prosecutor asked A.J. if defendant had hurt any other part of her body. She answered, "He had choked me twice." Both choking incidents took place at the campsite. "One of them was on its own[,] and one of them was during." The first time, the one on its own, was when defendant and A.J. were getting ready to return to the trailer. A.J. said something—she could not remember what—but "[she thought that defendant] got upset." He "grabbed [her] throat and threw [her] against a tree." It was "really hard to breathe," and she had felt "[s]cared" "on the inside." The other choking incident was during a sex act:

> "A. He was trying to put it in my bottom[,] and I kept screaming and moving around[,] and he flipped me over and held me to the ground with his hand by my throat.

Q. And where were you when this one happened?

A. At the campsite inside a tent."

¶ 43    She believed that "this stuff started" when she was seven. Early on, she was too young to understand or resent what defendant was doing. As a young child, she had loved her father and had felt safe around him, and it had never occurred to her to feel otherwise. After she grew older, however, there came a time when she just could not endure being violated any longer:

"A. [My mother] was saying that she's going to tell my dad everything that I had done that week and I had done some pretty bad things and I was scared because I didn't want anything happening to me.

* * *

Q. Why didn't you tell anyone that your dad had done these things to you before that night?

A. He kept telling me that if I told anybody he would go to jail."

¶ 44    On cross-examination, A.J. acknowledged testifying on direct examination that no one else was around when defendant put his penis in her mouth. She now testified, however, that on one occasion "there was one person around." Amanda H. was present one time when defendant had A.J. perform fellatio on him:

"A. She was sitting on the bed with [defendant].

Q. She was sitting upright?

A. Yes.

Q. Okay. How far away from you and your father was she?

A. My father was right next to her and I was on the floor playing on his phone.

- 12 -

Q. Okay. And your testimony is that you would have to have oral sex as a punishment, correct?

A. Yes.

Q. Isn't it true that you told the detective that every time he would bribe you?

A. Yes.

\* \* \*

Q. Is it fair to say that as a reward for [defendant's] placing his penis in your mouth you would be rewarded with Crash Bandicoot?

A. I was not wanting to but I did want to play the game."

¶ 45       Also, according to A.J.'s testimony on cross-examination. T.H., Amanda H.'s daughter, was "present during an encounter with [defendant]." Because T.H. already "knew about what was going on," there would have been no need for A.J. to tell her.

¶ 46                                    4. *The Testimony of T.H.*

¶ 47       T.H. testified that she was born on March 31, 2000, and that she was now 18 and a senior in high school. Her mother was Amanda H. In November or December 2014 and for about a year leading up to the end of 2015, T.H. sometimes lived with her mother and sometimes lived with her father, Walter P. During that approximate one-year period, her mother lived in a trailer park in Georgetown, Illinois, with defendant. Defendant's daughter, A.J., would come to the trailer for visits. At times, when Amanda H. was away at work, T.H. would be alone in the trailer with defendant.

¶ 48       At the prosecutor's request, the circuit court read to the jury the same other-crimes instruction that the court had read during A.J.'s testimony.

- 13 -

¶ 49     T.H. resumed her testimony. She testified that, during this period of about November or December 2014 to November or December 2015, when she was alone with defendant in the trailer, he would gradually unclothe her, fondle her breasts and vagina, and vaginally penetrate her with his penis. This happened 5 to 10 times, and he used a condom.

¶ 50     Also, T.H. testified, there was an occasion when defendant bent her over and "put his penis in [her] butt." He did this outside the trailer, on a cold night, in a "[p]retty secluded place" behind the railroad tracks. They were out that night because defendant was trying to get T.H. over her fear of darkness. For that ostensible purpose, he took her walking down the railroad tracks at night. A considerable distance down the railroad tracks was a campsite, but T.H. was unable to overcome her fear of the darkness, and they never reached the campsite. T.H. testified:

> "A. If I wouldn't—he said like if I wouldn't walk down there that he was gonna put his penis in my butt, and I didn't walk down there and he put his penis in my butt.
>
> Q. How did that happen?
>
> A. He ended up like putting his penis in my butt and I ran home."

¶ 51     When T.H. was in seventh or eighth grade, an investigator named Jones came to see her at school in Georgetown. Jones met with T.H. in the vice-principal's office and asked her if defendant had ever touched her or hurt her in any way. Because T.H. was scared, she falsely told Jones that nothing had happened. A couple of months later, in June, Jones met with T.H. again, this time in the public safety building. In this second interview, T.H. told Jones not everything but most of what defendant had done. She was still scared at the time. In October 2018, T.H. met with Jones again in the public safety building and was more forthcoming.

¶ 52     The prosecutor asked T.H.:

- 14 -

"Q. *** Now, those times that you met with the investigator from, you know, April and June, up and then to 2018 why didn't you tell law enforcement or tell an authority about what this defendant had done to you?

* * *

A. The defendant threatened me.

* * *

Q. This threat that you're about to tell us about do you remember when it happened?

A. He told me like more than once.

* * *

Q. Okay. And what would he say to you?

A. He would say if you would tell anybody that I would hurt you and your family."

¶ 53 On cross-examination, T.H. admitted that when Jones interviewed her, T.H., in April 2016, her mother, Amanda H., was no longer living with defendant. T.H. acknowledged that, nevertheless, on April 15, 2016, she "denied that [defendant] ever successfully touched her." Likewise, on June 10, 2016, she told the investigator that she could not recall a time when defendant ever succeeded in touching her. By October 18, 2018, however, she "wanted [defendant] locked up." She conceded that on April 15 and June 10, 2016, she "lied to the investigator." But she insisted that on October 18, 2018, she was being honest with the investigator by telling him that defendant "had threatened to kill [her]."

¶ 54                              5. *The Testimony of Amanda H.*

¶ 55 Amanda H. testified that, from 2014 to the end of 2015, she was in a dating relationship with defendant and that they used to live together in a trailer park in Georgetown. Sometimes Amanda H.'s daughter, T.H., stayed at the trailer, and sometimes she stayed with her father. Every other weekend and on holidays, defendant's daughter, A.J., would come to the trailer to visit him.

¶ 56 One day—Amanda H. could not remember when—she came home from work early because she was feeling sick. She took some medicine and lay down in her and defendant's bedroom, in the Georgetown trailer. No one else was in the bedroom. She fell asleep. She was awakened when defendant "came into the bedroom and *** plopped on the bed." She went back to sleep. The prosecutor asked Amanda H.:

"Q. *** Were you woken up again?

A. Later on. I don't know how much time had passed or anything but later on he nudged me and I looked up and he was on his side of the bed and [A.J.] was sitting at the side just talking to her dad and he asked me if [A.J.] could ever talk to me if she ever needed to, if she had any questions or curious, I'm like yeah no problem and then I just went back to sleep.

Q. Okay. Now, have you ever seen the defendant physically or sexually abuse [A.J.]?

A. No.

Q. But when you went back to sleep that night and the three of you were in that bedroom when you went to sleep do you know what happened between the defendant and [A.J.]?

* * *

A. No, I have no clue. I went back to sleep, sir."

¶ 57      On cross-examination, defense counsel asked Amanda H. if she had been nervous about having defendant around her daughter. She answered:

"A. Towards the end of the relationship because she was acting weird.

Q. But in the beginning were you nervous?

A. No."

¶ 58                    6. *The Testimony of Lisa Moment*

¶ 59      On April 19, 2016, A.J. was brought to Carle Clinic for a sexual assault examination. When A.J. arrived, Lisa Moment, the sexual assault nurse examiner, asked her if she knew why she was there. A.J. answered "that she was there because she had been raped" and that "she didn't want to say anything else about it."

¶ 60      As Moment was examining her, however, A.J. volunteered some further information. Moment testified:

" When I was doing her genital exam she had said that [']he made me suck his penis.['] She said when I was looking at the vaginal area that [']he put my—or put his fingers in my hole.['] When I clarified she was pointing to her vagina. When I examined her buttock area she said that [']he tried to put my penis—his penis in my butt and it hurt and I was bleeding.['] And then when I was doing her physical exam she stated that [']he tried to strangle me and my neck hurt.[']

¶ 61      Moment explained that, because at the time of the examination A.J. had not seen defendant in over seven days, she collected no evidence, that is, she did no swabbing. She saw no rectal injuries—and did not expect to see any considering the length of time that had passed since A.J. last saw defendant. (Rectal tissue, Moment explained, was fast-healing.) Although Moment

saw redness between A.J.'s vagina and rectum, Moment opined that the redness could have been caused by any number of nonsexual actions.

¶ 62        7. *The Prosecutor's Use of the Word "Rape" in His Closing Argument*

¶ 63        Despite the order *in limine*, the prosecutor used the word "rape" or a derivative of that word three times in his closing argument, without any objection by defense counsel. First, the prosecutor commented on A.J.'s demeanor: "You got to see that she wouldn't even look at the man that had been raping her because that's the fear that was in her eyes the entire time she was on the stand." Second, the prosecutor argued, "You know, the thing about timing, when a rape victim discloses what happens to her, that's their way. They get to control when that happens." Third, referring to defendant, the prosecutor argued, "[T]his child rapist was so brazen to do that in front of his girlfriend at the time when she's sleeping next to him."

¶ 64                D. The Sentencing Hearing

¶ 65        After denying defendant's motion for a new trial, the circuit court held a sentencing hearing.

¶ 66        According to the report of the presentence investigation, defendant had represented to the probation officer that he suffered from a chronically dislocated shoulder, several broken vertebrae, a steel bar and a pin in his hip, a cracked skull, and blindness in his left eye. Additionally, he had been diagnosed with post-traumatic stress disorder, intermittent explosive disorder, extreme anxiety, depression, and borderline personality disorder. He had not been prescribed any medications, however, and had not seen a physician in eight months.

¶ 67        In the sentencing hearing, defendant expressed skepticism that the Illinois Department of Corrections would "be able to give [him] adequate care for both his physical and mental conditions." Defense counsel echoed this skepticism. Also, he urged the circuit court to

consider the influence of defendant's psychological disorders on his conduct in this case. Defense counsel requested the court to impose a prison sentence between 6 and 15 years. The prosecutor, on the other hand, recommended the maximum sentence of 60 years' imprisonment.

¶ 68        After hearing the arguments and recommendations, the circuit court remarked that it could not "think of many things more despicable than what [defendant] did to [his] daughter and [his] stepdaughter." The court found no mitigating factors but only aggravating factors. In the court's view, there was a need for deterrence, and defendant's conduct had threatened or caused serious harm. The court imposed the maximum prison sentence of 60 years.

¶ 69                    E. The Postsentencing Motion

¶ 70        In a motion for reconsideration of the sentence, defendant claimed that (1) the circuit court had "fail[ed] to adequately weigh the factors in aggravation and mitigation," (2) the court had "fail[ed] to adequately consider the Defendant's mental health as a mitigating factor," and (3) "[t]he Sentence was excessive in light of the facts of the case." The court declined to reduce the sentence.

¶ 71        This appeal followed.

¶ 72                    II. ANALYSIS

¶ 73                    A. The Admission of T.H.'s Testimony

¶ 74            1. *The Degree of Factual Similarity Between T.H. and A.J.*

¶ 75        Traditionally, under case law, the State was forbidden to present evidence that the defendant had committed a crime in addition to the charged crime if the State's purpose in proving the other crime was to establish propensity: namely, that the defendant had a propensity to commit crime and that the defendant, therefore, consistent with his or her criminal nature, must have committed the charged crime. *People v. Placek*, 184 Ill. 2d 370, 384 (1998); *People v. Smith*, 406

- 19 -

Ill. App. 3d 747, 750 (2010). Case law barred propensity evidence. *People v. Lenley*, 345 Ill. App. 3d 399, 400 (2003).

¶ 76    It was not that propensity evidence lacked relevance. Common sense would suggest that if the defendant is prone to commit crime, that fact has some tendency to make it more probable than it otherwise might be that the defendant committed the charged crime—especially if the defendant has demonstrated a propensity to commit the particular type of crime with which the defendant is now charged. See Ill. R. Evid. 401 (eff. Jan. 1, 2011); *People v. Clark*, 2015 IL App (1st) 131678, ¶ 27. The problem with propensity evidence, then, was not a lack of probative value. See *Clark*, 2015 IL App (1st) 131678, ¶ 27. The problem was that the "inference [from propensity evidence was] so enticing that *** it [could] overshadow the jury's consideration of other evidence." *Id.*

¶ 77    The legislature has decided that, in prosecutions for certain kinds of sex offenses, that is a risk worth running—albeit with some limitations and safeguards. See 725 ILCS 5/115-7.3 (West 2018). Section 115-7.3 of the Code of Criminal Procedure of 1963 "only partly lifts the ban on propensity evidence." *People v. Kelly*, 2019 IL App (4th) 160598, ¶ 103. "If all the propensity evidence does is prove the defendant's propensity to do bad things in general, it remains inadmissible (see Ill. R. Evid. 404(b) (eff. Jan. 1, 2011)); the propensity evidence must more narrowly tend to prove the defendant's propensity to commit sexual offenses (see 725 ILCS 5/115-7.3(b) (West 2014))." *Kelley*, 2019 IL App (4th) 160598, ¶ 103.

¶ 78    Even this narrower type of propensity evidence is not automatically admissible. For one thing, the propensity evidence must be "otherwise admissible under the rules of evidence" (725 ILCS 5/115-7.3(b) (West 2018)), meaning that no rule of evidence other than the rule against propensity evidence stands in the way (*People v. Hayden*, 2018 IL App (4th) 160035, ¶ 117). Also,

any relevant evidence, including propensity evidence, "may be excluded"—despite its relevance—"if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 79 Section 115-7.3(c) (725 ILCS 5/115-7.3(c) (West 2018)) offers guidance on weighing probative value against "undue prejudice" (which we take as having practically the same meaning as "unfair prejudice" (Ill. R. Evid. 403 (eff. Jan. 1, 2011)) since prejudice that is unfair would be prejudice that is undue). That section provides as follows:

> "(c) In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:
>
> > (1) the proximity in time to the charged or predicate offense;
> >
> > (2) the degree of factual similarity to the charged or predicate offense; or
> >
> > (3) other relevant facts and circumstances."

Reading this statute together with Rule 403, we understand the question for the circuit court to be this: whether the probative value of the propensity evidence is substantially outweighed by the danger of unfair or undue prejudice. See Ill. R. Evid. 101, Comment (eff. Jan. 1, 2011) (commenting that "[t]here is no current statutory rule of evidence that is in conflict with a rule contained in the Illinois Rules of Evidence").

¶ 80 The qualifiers "unfair" or "undue" are crucial. Propensity evidence is *supposed* to be prejudicial to the defense. Otherwise, the State would have no reason to present it. And yet the propensity evidence must not be *unfairly* or *unduly* prejudicial. That is, the propensity evidence must not be unjustly prejudicial, and the prejudice that it inflicts on the defense must not "exceed[ ]

or violat[e] propriety or fitness." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/undue (last visited May 3, 2021).

¶ 81 Defendant argues that, because of the dissimilarity between his charged sexual assault of A.J. and his sexual assaults of T.H. as she described them, the probative value of T.H.'s testimony was low compared to the danger of unfair prejudice that it posed to the defense. Such a focus on methodology or mode of operation, however, loses sight of the question that propensity evidence would illuminate: Is defendant the type of person who would sexually assault young girls? It is important to keep in mind that propensity evidence is a form of *character evidence*. The general rule against propensity evidence begins, "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Ill. R. Evid. 404(a) (eff. Jan. 1, 2011). A defendant could have a character that in different circumstances expresses itself by different means. To illustrate what we mean, assume that propensity evidence is admissible in a prosecution for theft (although, really, it is not). If on one occasion the defendant picked someone's pocket and if on another occasion he stole a watch out of a gym locker and if on another occasion he siphoned gasoline out of someone's car, all of that behavior—despite the variety of means—would tend to suggest that the defendant is the type of person who would readily steal. Looking at the charge of theft, the trier of fact might ask, "Would this defendant do such a thing?" Yes, evidently he would. It is in this hypothetical defendant's character to be a thief. That is the salient point—never mind the different ways by which he has stolen.

¶ 82 Likewise, defendant's treatment of T.H. tended to show, arguably, that it was in his character to sexually exploit young girls under his supervision. And, arguably, that trait of

character was just as evident in his vaginal penetrations of T.H. in the trailer as in his oral penetrations of A.J. at the campsite.

¶ 83 We keep saying "arguably" because "a trial court's decision to admit 'other crimes' evidence will not be reversed unless the court abused its discretion." *People v. Nelson*, 2013 IL App (1st) 102619, ¶ 41. If a position is arguable, it is within the range of discretion. To say that the circuit court abused its discretion, we would have to be able to say, without exaggeration, that the court's ruling was "unreasonable, arbitrary, or fanciful, or [that] no reasonable person would adopt the court's view." *Id.*

¶ 84 Unless the identity of the perpetrator were at issue, a reasonable person could take the view that *how* defendant went about sexually assaulting one girl as opposed to another girl was relatively unimportant. See *People v. Boand*, 362 Ill. App. 3d 106, 122 (2005). The dispute in this case was not over identity. In other words, defendant did not take the position that, yes, A.J. may well have been sexually assaulted but that she had gotten the identity of the perpetrator wrong. In controversies over *who* the perpetrator is, the defendant's peculiar habitual way of committing the crime could serve as an incriminating calling card. See *People v. Wilson*, 214 Ill. 2d 127, 140 (2005) (explaining that "*modus operandi* refers to a pattern of criminal behavior so distinctive that separate crimes are recognized as the handiwork of the same person"). "However, where such evidence is offered for something other than *modus operandi*, mere general areas of similarity will suffice" (*Boand*, 362 Ill. App. 3d at 122), as in our theft illustration.

¶ 85 2. *The Abundance of Defendant's Prior Sexual*

*Assaults of A.J., According to Her Testimony*

¶ 86 In deciding whether the probative value of the propensity evidence is substantially outweighed by the danger of undue prejudice, the circuit court "may consider," as section

115-7.3(c)(3) puts it, "other relevant facts and circumstances" (725 ILCS 5/115-7.3(c)(3) (West 2018))—which is to say that the court is not limited to the first two factors in section 115-7.3(c) (*id.* § 115-7.3(c)). One relevant circumstance might be the amount of propensity evidence that already has been presented.

¶ 87 If propensity evidence consumes almost the entire trial (let us imagine an extreme case in which there are three days of propensity witnesses compared to a mere half-hour of testimony by the victim), the trial could turn into an implied invitation to find the defendant guilty simply because he is bad—simply because, given his history, he is so loathsome that he deserves whatever sanction can be meted out to him, regardless of whether it was proven beyond a reasonable doubt that he committed the charged offense. "The key to balancing the probative value of other crimes evidence to prove propensity against its possible prejudicial effect is to avoid admitting evidence that entices a jury to find defendant guilty *only* because it feels he is a bad person deserving punishment." (Emphasis in original and internal quotation marks omitted.) *People v. Johnson*, 406 Ill. App. 3d 805, 809 (2010). A lengthy barrage of other-crimes evidence, which is exempt from the exacting standard of proof beyond a reasonable doubt, might wear down the jury's objectivity and might tempt the jury to compromise on the standard of proof by using the other crimes as a backstop (if not *this*, then *those*).

¶ 88 In defendant's view, T.H.'s testimony was unnecessary considering that, from A.J., "the jury heard an overwhelming amount of evidence suggesting that [defendant] had a propensity to commit other sex offenses even without T.H.'s testimony." According to defendant, "A.J. accused [defendant] of putting his penis in her mouth roughly 85 times." Adding the 5 alleged instances of anal penetration, the circuit court "permitted the State to present an additional 90 other crimes to establish [defendant's] propensity to assault A.J."

¶ 89        In her testimony, however, it was not that A.J. described these additional 90 crimes one by one. Instead, she testified merely that "this stuff started" when, she believed, she "was seven" and that "it happened" "[a]t least once every time [she] went" to defendant's for bimonthly visitation. The jury was left to figure out arithmetically how many sexual assaults that would have totaled. It was not that A.J. recounted each sexual assault, one by one, so that the jury could keep a running tally. Rather, a sweeping summary was provided. Thus, it is untrue that "the jury heard an overwhelming amount of *evidence* suggesting that [defendant] had a propensity to commit other sex offenses even without T.H.'s testimony." (Emphasis added.) To be sure, if A.J. were believed, the number of defendant's prior sexual offenses against her was, by mathematical calculation, overwhelming. Contrary to defendant's assertion, though, the amount of evidence of those numerous prior sexual offenses was not overwhelming. The mere fact that, by inference from A.J.'s testimony, defendant allegedly perpetrated 90 prior sexual assaults against A.J. did not obviate the need for T.H.'s testimony.

¶ 90        In sum, we are unconvinced that all reasonable persons would regard the propensity evidence in this case as excessive in quantity. See *Nelson*, 2013 IL App (1st) 102619, ¶ 41. Defendant argues that "T.H.'s testimony did nothing more than create a mini-trial on the issue of whether [defendant] engaged in uncharged conduct." But such an argument could be made against *any quantity* of propensity evidence: that it creates a trial within a trial, a "mini-trial." A witness alleges an uncharged bad act, and defense counsel cross-examines the witness on the allegation. Even this is, in a manner of speaking, a trial over the bad act. When does the trial within a trial cease to be "mini"? There is no clear line.

¶ 91        Neither A.J. nor T.H. seemed eager to expand their account into a novel. They were to the point, almost laconic, in their testimony. The prosecutor asked enough questions to elicit

from them exactly what happened, the circumstances in which it happened, and where it happened and then moved on. Along the way, the prosecutor elicited enough details to give a sense that the recounted incidents were real. We find no abuse of discretion in the amount of propensity evidence admitted in this trial.

¶ 92                                      B. "Graphic Details" in A.J.'s Testimony

¶ 93          Defendant contends that, by "permit[ing] A.J. to testify to the graphic details of [defendant's] attempting to engage in anal penetration," the circuit court "went far beyond what was reasonably necessary to establish [defendant's] propensity to commit the offense in this case." Specifically, defendant complains of A.J.'s testimony that "[defendant's] actions caused a painful sensation[ ] and tore her flesh." Also, he complains of her testimony that he choked her on two occasions.

¶ 94          An argument could be made that such details are reasonably necessary because, without details, matters would be left unexplained and the account would come across as abstract and *pro forma* and, hence, unconvincing. A certain amount of granularity is necessary. The more detailed an account is, the more believable it tends to be because a self-consistent, detailed story is difficult to make up. For example, soggy waffles and thick warmth are difficult for the typical 13-year-old to make up. That is why serious interrogations intent on ferreting out the truth insist on details, sordid though the details might be. If the person answering the questions can paint a vivid picture in the interrogator's mind, with all the incidental details filled in, and if the picture coheres, that person is more likely to be believed than someone who makes an unelaborated assertion. We see no reason why the prosecution should be required to sabotage itself by keeping the testimony on a level of pale generality. If the prosecution is allowed to present propensity evidence, the prosecution should be allowed to do so with effectiveness—which is to say, vividly.

¶ 95    Details can be not only vivid but explanatory. Without hearing A.J.'s testimony that defendant choked her on two occasions, the jury might have been left wondering why she submitted to sexual abuse for so long, including sexual abuse that tore her flesh. Perhaps, in the jury's mind, the aura of paternal authority would have been an insufficient explanation. The jury might have expected that, especially for a child as impulsive and restless as A.J., the habit of deference would have worn off long ago. Especially as she grew older, why did A.J. not say, "No more," and simply walk away? Why did she not complain sooner to another adult? The explanation (the State apparently meant to show) was that A.J. was physically afraid of defendant—and with good reason, because he had grabbed her by the neck and had lifted her off her feet.

¶ 96    The choking incidents were aggravated batteries (720 ILCS 5/12-3.05(a)(5) (West 2016)), uncharged offenses. For batteries, section 115-7.3(b) (725 ILCS 5/115-7.3(b) (West 2018)) has not lifted the ban on propensity evidence. Nevertheless, evidence of other crimes may be admissible for purposes other than to prove propensity. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Arguably, the purpose of revealing the choking incidents was to explain A.J.'s submissiveness to the prolonged sexual abuse. Providing this explanation was a legitimate purpose other than to show propensity. The State's theory was that, for a long time, well-founded physical fear restrained A.J. from resisting defendant and from complaining to others.

¶ 97    C. Moment's Testifying to What A.J. Told Her

¶ 98    When A.J. arrived to be examined, Moment asked her if she knew why she was there. A.J. answered "that she was there because she had been raped" and that "she didn't want to say anything else about it." As Moment was examining her, however, A.J. volunteered some further statements. To quote from Moment's testimony again:

" When I was doing her genital exam she had said that [']he made me suck his penis.['] She said when I was looking at the vaginal area that [']he put my—or put his fingers in my hole.['] When I clarified she was pointing to her vagina. When I examined her buttock area she said that [']he tried to put my penis—his penis in my butt and it hurt and I was bleeding.['] And then when I was doing her physical exam she stated that [']he tried to strangle me and my neck hurt.[']

¶ 99       Defendant contends that those statements by A.J., recounted by Moment, should have been excluded from the trial because they were irrelevant and hearsay and that, by failing to object to those statements, defense counsel rendered ineffective assistance. Defendant acknowledges the hearsay exception in section 115-13 (725 ILCS 5/115-13 (West 2018)) for statements by victims of sex offenses to medical personnel. Nevertheless, he maintains that A.J.'s statements to Moment, a sexual assault nurse examiner, were solely for investigatory purposes, not "for purposes of medical diagnosis or treatment." *Id.* Therefore, he disputes that the statements fell within the hearsay exception in section 115-13. Any reasonable defense counsel, he claims, would have objected to the statements.

¶ 100       Cases say that defense counsel's decision not to object to testimony "involves a matter of trial strategy." *People v. Theis*, 2011 IL App (2d) 091080, ¶ 40; see also *People v. Sparks*, 335 Ill. App. 3d 249, 254 (2002). But, surely, that is not always true. Refraining from objecting is not always part of a strategy or plan. One would expect that, often, defense counsel might decide not to object simply because, in their judgment, they lack grounds for an objection. In that case, their only "plan" is to refrain from frivolity. Sometimes, though, even when they have grounds for an objection, defense counsel might decide not to object because they believe they can make something of the objectionable testimony. They believe that the objectionableness, whatever it is,

is worth putting up with because they have found something in the testimony that they might turn against the prosecution. It is then that the omission of an objection can be aptly characterized as strategy.

¶ 101        Let us assume, for the sake of argument, that Moment's testimony was objectionable on the grounds of irrelevance and hearsay. Even so, judging by his cross-examination of Moment, defense counsel had a strategic basis for refraining from objecting. In his cross-examination, defense counsel pursued this strategy by highlighting some of the words that A.J. used in her statement to Jones. The terminology that A.J. used in her statement to Moment on April 19, 2016, was different from the terminology that she used in her statement to Jones a mere four days earlier, on April 15, 2016. In her statement to Jones, A.J. referred to defendant's penis as his "middle part," whereas, in her statement to Moment, A.J. *twice* used the anatomical term "penis": a term that A.J. could not bring herself to utter in the trial and that she would only spell for the jury. With Jones she used the term "bottom," whereas with Moment she used the term "butt." With Jones she used the work "choke," whereas with Moment she used the word "strangle." With Jones she used the word "molested," whereas with Moment she used the word "raped."

¶ 102        After confirming with Moment that she, Moment, was quoting A.J. exactly, defense counsel obtained Moment's agreement that, when interviewing children, sexual assault nurse examiners were supposed to ask open-ended questions. The questions had to be non-leading because "asking closed-ended questions might essentially indoctrinate the child to something that happened." The drift of defense counsel's cross-examination was that A.J. *had* been indoctrinated, as the jury ought to infer from the extensive changes in her vocabulary, and that because A.J. had been indoctrinated—because her account had been influenced by adult authority figures—she should not be believed.

¶ 103 To score this point against the prosecution, defense counsel had to make the strategic choice of not resisting Moment's testimony, not objecting to it. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Allowing Moment to testify without objection might be considered sound trial strategy. We defer to defense counsel's strategic decision.

¶ 104                          D. The Use of the Word "Rape"

¶ 105 In a pretrial motion *in limine*, defense counsel requested an order forbidding "the State and all witnesses [to] us[e] the words 'rape,' 'rapist,' or 'raping' in their testimony." In support of that request, defense counsel represented to the circuit court that, "[p]ursuant to [section 115-11.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-11.1 (West 2018))], the use of the word 'rape', 'rapist', or any derivative of the word by any victim, witness, attorney or other court personnel [was] *not admissible*." (Emphasis added.)

¶ 106 Actually, section 115-11.1 said precisely the opposite:

"The use of the word 'rape', 'rapist', or any derivative of 'rape' by any victim, witness, State's Attorney, defense attorney, judge or other court personnel in any prosecutions of offenses in Sections 11-1.20 through 11-1.60 or 12-13 through 12-16 of the Criminal Code of 1961 or the Criminal Code of 2012 [(720 ILCS 5/11-1.20 to 1.60, 12-13 to 12-16 (West 2018))] is *not inadmissible*." (Emphasis added.) 725 ILCS 5/115-11.1 (West 2018).

(The offense with which defendant was charged, predatory criminal sexual assault of a child, was defined by section 11-1.40(a)(1) of the Criminal Code of 2012 (720 ILCS 5/11-1.40(a)(1) (West 2016)).) And yet, the State did not object to this request by defense counsel, and the circuit court granted the request, barring the State from using the word "rape" or any derivative of the word.

¶ 107    As it turned out, the word "rape" got used in the jury trial anyway. Moment quoted A.J. as telling Moment that she, A.J., "had been raped." Also, in his closing argument—without triggering any objection—the prosecutor used the word "rape" (or a derivative of that word) three times.

¶ 108    Defendant accuses defense counsel of rendering ineffective assistance by failing to seek enforcement of the circuit court's order *in limine*, specifically, by failing to object to those repeated uses of the word "rape." Defense counsel had no obligation, however, to make a futile objection. See *People v. Bradford*, 2019 IL App (4th) 170148, ¶ 14. Because defendant is not entitled to "the luck of a lawless decisionmaker" (*Strickland*, 466 U.S. at 695), we assume that if defense counsel had made a trial objection to the use of the word "rape," the circuit court would have changed its mind about its order *in limine*—as the court would have had the right to do (see *People v. Zimmerman*, 2018 IL App (4th) 170695, ¶ 147)—and that, on the authority of section 115-11.1 (725 ILCS 5/115-11.1 (West 2018)), the court would have overruled the objection. We see no reason to criticize defense counsel insomuch as, ultimately, he refrained from making a legally unmeritorious objection. See *Bradford*, 2019 IL App (4th) 170148, ¶ 14.

¶ 109    Apart from the question of legal merit, the wisdom of such an objection would have been questionable. If defense counsel had objected to the use of the word "rape," the indignant reaction in the minds of the jurors might have been, "Well, what would *you* call it?" We do not see any prejudice from using the word "rape" as opposed to using the more unpleasantly descriptive

term "predatory criminal sexual assault of a child." See *Bradford*, 2019 IL App (4th) 170148, ¶ 14 (explaining that, "[t]o prevail on *** a claim [of ineffective assistance], a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant" (internal quotation marks omitted)).

¶ 110                          E. The Severity of the Sentence

¶ 111          Under statutory law, defendant's conviction of predatory criminal sexual assault of a child made him eligible for a prison sentence of 6 years at the least and 60 years at the most. See 720 ILCS 5/11-1.40(a)(1), (b)(1) (West 2016). The circuit court sentenced him to the maximum of 60 years' imprisonment.

¶ 112          That sentence was within the range set by statutory law. "Where the sentence chosen by the trial court is within the statutory range permissible for the pertinent criminal offense for which the defendant has been tried and charged, a reviewing court has the power to disturb the sentence only if the trial court abused its discretion in the sentence it imposed." *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995). This standard of review is the most deferential standard of review recognized by the law. *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 15. To characterize a sentence as an abuse of discretion, we would have to conclude that, under the particular circumstances of the case, a sentence of such severity is arbitrary: that is, the sentence makes no sense and is rationally indefensible. See *People v. Butler*, 2013 IL App (1st) 120923, ¶ 30. In other words, we would have to conclude that the sentence is so obviously excessive that no reasonable person, pondering the question reasonably, could possibly agree with it. *Id.*

¶ 113          As the appellate court has explained, this does not mean deciding anew how many years of imprisonment the defendant deserves:

"It is well established that the trial court has broad discretionary powers in imposing a sentence, and the sentencing decision of the court is entitled to great deference. [Citation.] The trial court is afforded great deference because it is in a better position than the reviewing court to determine the appropriate sentence. [Citation.] The trial judge has the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. [Citation.] Thus, the reviewing court cannot substitute its judgment for that of the trial court just because it would have weighed these factors differently. [Citation.] Absent an abuse of discretion, the sentence imposed by the trial court may not be altered on review. [Citation.] An abuse of discretion occurs when the trial court's decision is fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *Id.*

Thus, if reasonable minds could disagree on whether the maximum of 60 years' imprisonment is a fitting sentence for defendant, our duty is to find no abuse of discretion and to defer to the circuit court's sentencing decision.

¶ 114       For four reasons, defendant contends that his sentence is an abuse of discretion. First, he had few prior convictions, all of which were misdemeanors. Second, in deciding on the sentence, the circuit court considered T.H.'s "unproven and unrelated" allegations. Third, the court "refused to recognize [defendant's] mental health as a factor in mitigation." Fourth, the court failed to consider the extent to which imprisonment would endanger defendant's precarious medical condition.

¶ 115                            1. *Criminal History*

¶ 116 Defendant had three prior criminal convictions, all of them misdemeanors: retail theft in 2002 and battery and domestic battery in 2007. In defendant's view, the circuit court "neglected to consider" that this scanty criminal history "did not warrant a 60-year sentence." He argues that his "criminal background did not warrant a heightened sentence or indicate that he [could not] become a productive member of society."

¶ 117 That defendant's "criminal background did not warrant a heightened sentence" could be reasonably disputed. In 2007, defendant was convicted and punished for domestic battery, which, essentially, was violence against a family member. And yet, despite that judicial reproof of his violation of another family member's bodily autonomy, he persisted in his acts of sexual violence against his daughter, A.J. He did not thereby demonstrate great potential for rehabilitation.

¶ 118 2. *The Consideration of Other, Uncharged Crimes*

¶ 119 In the sentencing hearing, the circuit court told defendant, "I can't think of many things more despicable and inexcusable than what you did to your daughter *and your stepdaughter*." (Emphasis added.) Defendant finds the emphasized phrase to be problematic. By its use of that phrase, the court revealed "that it was considering [defendant's] alleged conduct with T.H., the daughter of his girlfriend." (T.H. was not really defendant's stepdaughter, but apparently the court thought of her as such, mistaking T.H.'s mother, Amanda H., for defendant's wife.) Defendant complains that the court "inappropriately imposed a heightened sentence when it explicitly relied on unproven conduct that was unrelated to [defendant's] conviction in this case." Quoting from *People v. Fern*, 189 Ill. 2d 48, 55 (1999), defendant argues that "the trial court is charged with fashioning a sentence based on the particular circumstances of the individual case."

¶ 120    But that is not all the supreme court said in *Fern*. Let us quote the full sentence from which defendant rather selectively lifts his quotation: "Within th[e] statutory range, the trial court is charged with fashioning a sentence based upon the particular circumstances of the individual case, *including* the nature of the offense and *the character of the defendant*." (Emphases added.) *Id.* Thus, the particular circumstances of the case are not limited to the nature of the charged offense, important as that circumstance is. The particular circumstances of the case also include the defendant's character.

¶ 121    The law is clear: in a sentencing hearing, "[p]roof of prior misconduct not resulting in prosecution or conviction is admissible as relevant to the question of defendant's character." *People v. Johnson*, 114 Ill. 2d 170, 205 (1986). The prior misconduct need not be proven by clear and convincing evidence. The evidence of prior misconduct merely has to be relevant and reliable, and it is for the circuit court to decide, in its discretion, whether the evidence meets that standard. *Id.* T.H. testified under oath, and she was subject to cross-examination. We find no abuse of discretion in the circuit court's consideration of T.H.'s testimony when the court decided on a sentence. See *People v. Richardson*, 123 Ill. 2d 322, 362 (1988) (concluding "that the circuit court did not abuse its discretion in admitting evidence of the seven offenses for which defendant was arrested but not convicted").

¶ 122        3. *The Behavioral Effect of Defendant's Psychological Disorders*

¶ 123    Defendant observes that the circuit court "refused to recognize his mental health as a factor in mitigation." As revealed in the presentence investigation report, defendant had been diagnosed with post-traumatic stress disorder, intermittent explosive disorder, depression, anxiety, and borderline personality disorder. In the sentencing hearing, however, the court remarked, "When I consider the factors in mitigation in this case what [*sic*] the factors that [defense counsel]

wanted me to consider about your mental health I do not find that a factor in mitigation." Defendant challenges this "out-of-hand rejection." He complains that the court "refused to even entertain the notion that [defendant's] mental health had some effect on his behavior in this case."

¶ 124    But if *that* is the notion to be entertained—that defendant's sexual assaults of children were attributable to his psychological disorders—then his psychological disorders should be regarded as aggravating instead of mitigating. See *People v. Ballard*, 206 Ill. 2d 151, 190 (2002). If defendant's psychological disorders make him dangerous to children, that is a reason to keep him in prison.

¶ 125    4. *Whether Imprisonment Would Endanger Defendant's Medical Condition*

¶ 126    a. His Physical Injuries

¶ 127    Defendant complains that the circuit court failed to consider the mitigating factor that "imprisonment *** would endanger his *** medical condition." 730 ILCS 5/5-5-3.1(a)(12) (West 2016). According to the presentence investigation report, defendant reported the following injuries or physical infirmities:

> "The defendant advised he suffers from carpal tunnel in both wrists and tendinitis in both elbows. He further advised his right shoulder has been dislocated eighteen plus times; he tore his ACL in his right shoulder; he has problems with his ears due to bad ear infections; he broke his back; he has a steel bar and pin in his hip; he has a crack in his skull; and he is blind in his left eye."

Those were physical conditions reported by defendant, who could be believed or disbelieved. It was up to the circuit court to assess his credibility. See *People v. Ramos*, 353 Ill. App. 3d 133, 137 (2004). The court could have decided that if defendant could strong-arm his teenage daughter into having sex with him, he was not quite as physically decrepit as he made himself out to be.

¶ 128    In any event, we should not simply assume that imprisonment will endanger defendant's medical condition. Defendant would have to give us some basis for so concluding. See *People v. Manning*, 227 Ill. 2d 403, 422 (2008) ("The eighth amendment to the United States Constitution requires that inmates receive adequate medical care."); 730 ILCS 5/3-7-2(d) (West 2018) ("All institutions and facilities of the Department [of Corrections] shall provide every committed person with *** medical *** care.").

¶ 129    In the sentencing hearing, defense counsel asked defendant if he believed that he would receive adequate medical and psychological care while in prison, and defendant answered, "No. No way." Defendant argues that this belief "is somewhat corroborated by the presentence investigation [report], where [defendant] 'advised that he is not prescribed any medicine right now and he was last seen by a physician in August 2018,' nearly eight months before the sentencing hearing." Defendant needs to explain the logic of this so-called corroboration. How could the medical neglect supposedly revealed by the report of the *pre*sentence investigation be the fault of the Illinois Department of Corrections? It would seem that, until defendant was sentenced, the Illinois Department of Corrections would have had nothing to do with him. Arguably, then, the mitigating factor in section 5-5-3.1(a)(12) was unproven. See 730 ILCS 5/5-5-3.1(a)(12) (West 2016) (providing that it is a mitigating factor that "[t]he imprisonment of the defendant would endanger his or her medical condition").

¶ 130    In sum, we are unable to say that the circuit court abused its discretion by finding no mitigating factors and by deciding that, in the particular circumstances of defendant's case, imprisonment for the maximum of 60 years was the fitting punishment.

¶ 131                         III. CONCLUSION

¶ 132    For the foregoing reasons, we affirm the circuit court's judgment.

¶ 133    Affirmed.