2021 IL App (1st) 192055-U

SIXTH DIVISION
October 29, 2021

No. 1-19-2055

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 16235 |
| | ) | |
| WILLIAM BRONAUGH, | ) | Honorable |
| | ) | James Michael Obbish, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court.
Justices Harris and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1     *Held*:   We affirm defendant's conviction where the trial court did not abuse its discretion in admitting other-crimes evidence.

¶ 2     Following a jury trial, defendant William Bronaugh was found guilty of domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2016)) and sentenced to two years' probation, a domestic violence program, and 30 days in the sheriff's work release program. On appeal, Mr. Bronaugh argues that the trial court abused its discretion by allowing the State to introduce evidence of a prior act of domestic violence. We affirm.

¶ 3                                          I. BACKGROUND

¶ 4      Mr. Bronaugh was charged by information with multiple offenses against Maria Sanchez, with whom he had a child in common. The State proceeded on count I for aggravated domestic battery predicated on strangling Ms. Sanchez (720 ILCS 5/12-3.3(a-5) (West 2016)), count VIII for unlawful restraint (720 ILCS 5/10-3 (West 2016)), and count IV, which charged that Mr. Bronaugh committed domestic battery by causing bodily harm. (720 ILCS 5/12-3.2(a)(1) (West 2016)).

¶ 5      Prior to trial, the State filed a motion to admit proof of other crimes. Regarding the charged offenses, the State proffered that, on October 25, 2017, Mr. Bronaugh twice grabbed Ms. Sanchez by the throat, and strangled her for about 15 seconds, during a dispute over who would watch their baby daughter while Ms. Sanchez worked. The State sought to introduce further evidence that (1) on July 21, 2017, Mr. Bronaugh threatened to kill Ms. Sanchez; (2) on April 7, 2015, Mr. Bronaugh struck Erica Soriano, his then-girlfriend, and subsequently pled guilty to misdemeanor domestic battery; and (3) on July 13, 2015, Mr. Bronaugh followed Ms. Soriano from work and stood outside her vehicle while she occupied it, and subsequently pled guilty to violating Ms. Soriano's order of protection against him.

¶ 6      At a hearing, the State argued that Mr. Bronaugh hit and strangled Ms. Sanchez, and the strangulation showed an "escalation" of domestic violence. As no eyewitness could corroborate Ms. Sanchez's account of the attack on October 25, 2017, the other-crimes evidence was necessary to show Mr. Bronaugh's propensity to commit domestic violence and buttress Ms. Sanchez's "credibility about what happened." Mr. Bronaugh argued that the incident against Ms. Soriano on April 7, 2015, should be excluded because it was two years prior, involved a different victim, and involved striking, not strangling.

¶ 7       The court denied the State's motion as to the July 21, 2017, and July 13, 2015, incidents because of their dissimilarities to the charged offenses. However, the court granted the motion as to the April 7, 2015, incident, stating:

> "It is a different complaining witness. It is a couple of years distance as far as proximity in time, but I do believe that the probative value of the defendant striking another domestic partner in the face and in the arm in committing a domestic battery is more probative than prejudicial. The mere fact that it's a different woman. The mere fact that it was some two years apart are taken into consideration by this Court, but I believe that still the propensity issue is proven. I find it's more probative as to propensity than prejudicial to the defendant."

¶ 8       At trial, Ms. Sanchez testified that, on October 25, 2017, she had been dating Mr. Bronaugh for about three years. Ms. Sanchez, Mr. Bronaugh, and their one-year-old daughter lived together on the 3100 block of West 57th Street, in Chicago, but Ms. Sanchez intended to end their relationship and move out.

¶ 9       That day, Ms. Sanchez prepared to go to work around 3 or 3:30 p.m. Ms. Sanchez's mother, Rosa Martinez, lived a few blocks away, and Ms. Sanchez normally walked the baby to Ms. Martinez's house, where Ms. Martinez would watch her while Ms. Sanchez worked. Mr. Bronaugh wanted to watch the baby, however, and became upset when Ms. Sanchez prepared to leave. Mr. Bronaugh also accused Ms. Sanchez of having an affair with his cousin.

¶ 10      Ms. Sanchez descended the stairs from their apartment and exited with the baby in a stroller. The argument continued outside. Ms. Sanchez then began walking towards Ms. Martinez's, and Mr. Bronaugh followed, while the baby remained in the stroller outside the apartment. When Ms. Sanchez was about half a block from the apartment, Mr. Bronaugh pulled

her back by her upper right arm and wrists.

¶ 11     Ms. Sanchez refused to reenter the apartment, and Mr. Bronaugh grabbed her neck and choked her. Ms. Sanchez called 9-1-1, which upset Mr. Bronaugh, and she put her phone in her pocket without disconnecting the call. Ms. Sanchez agreed to go inside and removed the baby from the stroller, which Mr. Bronaugh began to take inside. Ms. Sanchez then turned to leave, and Mr. Bronaugh "strangle[d]" her, squeezing her neck with both hands in the vestibule until she felt she would lose consciousness and die. Ms. Sanchez could not stand and leaned on the door. Mr. Bronaugh threatened to kill her.

¶ 12     Ms. Sanchez managed to exit the building and began walking towards Ms. Martinez's. Mr. Bronaugh followed her, grabbed her arms, and tried to pull her back to the apartment. This hurt Ms. Sanchez's arms. Ms. Martinez then approached the two of them and a police vehicle drove by. Ms. Sanchez alerted the police car, told an officer what happened and showed him bruises on her neck and arms.

¶ 13     Ms. Sanchez identified photographs of her injuries and the audio of her 9-1-1 call, which she stated contained her and Mr. Bronaugh's voices and was published in court. The exhibits are in the record on appeal. The 9-1-1 call begins with Ms. Sanchez stating, "leave me alone." She then starts to respond to the 9-1-1 operator but begins coughing and wheezing. The remainder of the call, which exceeds four minutes, is largely unintelligible, but Ms. Sanchez and Mr. Bronaugh speak angrily, Ms. Sanchez repeatedly screams, Mr. Bronaugh asks her to stop, and a baby cries.

¶ 14     On cross-examination, Ms. Sanchez testified that she and Mr. Bronaugh slept in different rooms the night prior to the incident. Mr. Bronaugh had cheated on her, but Ms. Sanchez denied that was why she sought to end the relationship. They began to argue as she left the apartment. She left the baby in the stroller at the building's entrance, walked into the street, and Mr. Bronaugh

pulled her about three meters back. Ms. Sanchez called 9-1-1 when Mr. Bronaugh first grabbed her neck. The police vehicle arrived after a few minutes. The officers did not immediately photograph her injuries, but were present when her injuries were photographed at her mother's house a few minutes later.

¶ 15    On redirect examination, Ms. Sanchez testified that she left the baby with Mr. Bronaugh so she could walk to Ms. Martinez's and call the police from there. She told Mr. Bronaugh she would return to the apartment and did not scream because she feared he would hurt her.

¶ 16    Ms. Martinez testified that she planned to babysit Ms. Sanchez's daughter on October 25, 2017. That day, Ms. Martinez received a text message from Ms. Sanchez and then walked towards Ms. Sanchez's home. From two blocks away, she saw Mr. Bronaugh "tussling" with Ms. Sanchez. Ms. Sanchez held the baby, and Mr. Bronaugh's hands were on her arms, "trying to take her into the building." The State noted that Ms. Martinez "crossed her arms touching both biceps" and "twist[ed] back and forth," and the court added that she was "rotating at the waist back and forth, rotating her torso back and forth as well." Mr. Bronaugh pulled Ms. Sanchez about three feet towards the apartment building.

¶ 17    Ms. Martinez approached Mr. Bronaugh and Ms. Sanchez, and heard them argue. Ms. Sanchez's breathing was "accelerated" and she had finger marks on her neck. The State noted that Ms. Martinez grabbed her neck with both hands. Ms. Sanchez also had marks on her arms that Ms. Martinez had not seen before.

¶ 18    On cross-examination, Ms. Martinez testified that she had last seen Ms. Sanchez around 6 p.m. the day prior. When she saw Mr. Bronaugh and Ms. Sanchez, his arms were wrapped around her as if he were hugging her. It took Ms. Martinez about three minutes to approach them, but she did not call the police.

¶ 19    Chicago police officer Brian Glim testified that he and his partner responded to a 9-1-1 call on the 3100 block of West 57th Street around 4 p.m. on October 25, 2017. Officer Glim observed Mr. Bronaugh, Ms. Sanchez, Ms. Martinez, and the baby. Ms. Sanchez and Mr. Bronaugh argued. The officers exited their unmarked vehicle and approached, and before Officer Glim asked any questions, Ms. Sanchez stated that Mr. Bronaugh choked her. Ms. Sanchez's neck and wrists had redness and bruising.

¶ 20    Officer Glim separated Mr. Bronaugh and Ms. Sanchez, and Mr. Bronaugh stated that he grabbed Ms. Sanchez's wrist, but "nothing physical had happened" and he did not hit Ms. Sanchez. Officer Glim moved to the front seat of the vehicle to check Mr. Bronaugh's name, while Mr. Bronaugh sat in the rear. Unprompted, Mr. Bronaugh repeated that he grabbed Ms. Sanchez by the wrist but did not "get physical" or hit her. Officer Glim identified footage from his body-worn camera, three clips of which were published, are in the record on appeal, and are consistent with Officer Glim's testimony. In the clips, Mr. Bronaugh also denies dragging Ms. Sanchez down the street. On cross-examination, Officer Glim testified that he did not see Mr. Bronaugh touch Ms. Sanchez, he had never seen Ms. Sanchez before and did not know if her injuries existed previously, and Ms. Sanchez declined medical attention.

¶ 21    Chicago police sergeant William Murawski testified that he spoke with Ms. Sanchez at the police station the morning of October 26, 2017, and observed redness and swelling on her neck and lower arms. At the time of this incident, he had been a detective. On cross-examination, Sergeant Murawski testified he had never seen Ms. Sanchez before, Ms. Sanchez indicated displeasure with the financial support Mr. Bronaugh provided, and their argument concerned infidelity and where the baby would stay that day. On redirect examination, Sergeant Murawski testified that Ms. Sanchez did not believe Mr. Bronaugh would properly care for the baby, "seemed

shaken up," and stated that Mr. Bronaugh accused her of cheating. According to Sergeant Murawski, "one of the reasons" Ms. Sanchez left the baby with Mr. Bronaugh and walked towards Ms. Martinez's was fear that Mr. Bronaugh would batter her.

¶ 22 The State called Ms. Soriano. Before her testimony, the court instructed the jury that her testimony was only offered to show Mr. Bronaugh's propensity to commit domestic violence.

¶ 23 Ms. Soriano testified that, on April 7, 2015, she had been dating Mr. Bronaugh for over two years, but they had problems in their relationship. Around 2 a.m., Mr. Bronaugh called Ms. Soriano and stated he needed to go to the emergency room. Ms. Soriano drove to his home, and Mr. Bronaugh entered her vehicle, accused her of cheating, punched her repeatedly, and took her cell phone. Ms. Soriano's face swelled, she had a black eye, and her "whole left side" was bruised.

¶ 24 On cross-examination, Ms. Soriano testified that she was married on April 7, 2015. She denied knowing that Mr. Bronaugh was dating Ms. Sanchez on that date, and did not file felony charges.

¶ 25 On redirect examination, Ms. Soriano confirmed that charges were eventually filed and she received an order of protection against Mr. Bronaugh which protected her, her children, her parents, and her children's father. On recross-examination, Ms. Soriano denied driving near Mr. Bronaugh's home while the instant case pended, but stated she lived in the area.

¶ 26 Mr. Bronaugh testified that he and Ms. Sanchez began dating around July 2014. Around October 2016, Mr. Bronaugh told Ms. Sanchez that he "was losing interest" in their relationship and had a child with an ex-girlfriend. The night of October 24, 2017, Ms. Sanchez, Mr. Bronaugh, and their daughter slept in the only bedroom of Mr. Bronaugh's apartment. Ms. Sanchez had work the next day, but Mr. Bronaugh did not. Ms. Sanchez normally paid Ms. Martinez to watch the baby while Ms. Sanchez worked. Mr. Bronaugh, raised the possibility of the baby staying with

him the next day while Ms. Sanchez worked, since it was the first time he'd had the day off when Ms. Sanchez was working. Ms. Sanchez ignored him. The same thing happened the next morning.

¶ 27 When Ms. Sanchez prepared to leave for work, Mr. Bronaugh helped carry the baby downstairs in the stroller. Mr. Bronaugh again asked if the baby could stay with him, but Ms. Sanchez stated she had not yet discussed it with Ms. Martinez. The conversation became "heated," and also spread to discussion of Mr. Bronaugh's prior infidelity and how he had "other women around." Ms. Sanchez moved about five feet away, stated she would not argue and had to go to work, and threatened to call the police. She also warned that, given his incident with Ms. Soriano, Mr. Bronaugh could go to jail. As Mr. Bronaugh took two steps towards Ms. Sanchez, she began "screaming" and "running" down the street. Ms. Sanchez's mood had changed quickly, which had happened before. Mr. Bronaugh took the baby out of the stroller and "calmly" followed her. He "calmly" grabbed her wrist, asked her to stop being "hysterical," and pulled her to the sidewalk. He released her wrist, and they returned to the apartment, "[m]ildly" arguing.

¶ 28 In front of the apartment building, they continued to argue over whether Mr. Bronaugh could watch the baby. The baby was crying, so Mr. Bronaugh gave her to Ms. Sanchez. Ms. Sanchez said he could keep the baby, but could not ask her for help and walked away. Mr. Bronaugh pleaded for her to return, and she did. They stood in front of the door to the apartment building, then moved to the grass, when the police arrived and the argument ended. Ms. Martinez also arrived, but she was not present when Ms. Sanchez was in the street or when they went "back and forth" into the apartment building. Mr. Bronaugh denied touching Ms. Sanchez except for pulling her out of the street by her wrist.

¶ 29 Mr. Bronaugh further testified that he dated Ms. Soriano from 2012 to 2014, when he ended their relationship because Ms. Soriano's husband kept contacting him. Ms. Soriano wanted to

reunite, but Mr. Bronaugh did not. Mr. Bronaugh did not recall seeing Ms. Soriano on April 7, 2015, but in May 2015, he went to court for an incident with Ms. Soriano.

¶ 30    On cross-examination, Mr. Bronaugh denied accusing Ms. Sanchez of infidelity and testified he only touched her once. When asked if Ms. Sanchez's injuries were present the night prior, Mr. Bronaugh responded that he was not paying attention to her. Ms. Sanchez did not walk toward Ms. Martinez's home, and he pulled her by the wrist to remove her from the street, where there were oncoming vehicles.

¶ 31    During closing arguments, the State argued that Ms. Soriano testified for "the sole purpose of letting [the jurors] all know" that Mr. Bronaugh was the "kind of person" who attacks the women he dates out of jealousy and a desire for power and control. Following closing arguments, the court again instructed the jury that the other-crimes evidence was submitted only on the issue of Mr. Bronaugh's propensity to commit domestic violence, and it was for the jury to determine whether he was involved in that offense and how to weigh it.

¶ 32    The jury found Mr. Bronaugh guilty of domestic battery and not guilty of unlawful restraint. It deadlocked on the aggravated domestic battery charge, which the State subsequently nol-prossed. Mr. Bronaugh filed an amended motion for a new trial arguing, in relevant part, that the court erred in allowing Ms. Soriano's other-crimes testimony to show Mr. Bronaugh's propensity for domestic violence. The court denied the motion. The court sentenced Mr. Bronaugh to two years' probation, a domestic violence program, and 30 days in the sheriff's work release program. Mr. Bronaugh's motion to reconsider sentence was denied.

¶ 33                                II. JURISDICTION

¶ 34    Mr. Bronaugh was sentenced on September 4, 2019, and timely filed his notice of appeal on September 19, 2019. We have jurisdiction over this appeal under Illinois Supreme Court Rule

603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from final judgments in criminal cases.

¶ 35                                    III. ANALYSIS

¶ 36    On appeal, Mr. Bronaugh argues that the trial court erred in allowing Ms. Soriano's testimony to establish his propensity for domestic violence because the testimony was substantially more prejudicial than probative. Mr. Bronaugh contends that the other-crimes evidence lacked proximity and factual similarity to the charged offense, and the error was not harmless.

¶ 37    Proof of other crimes is generally inadmissible to show a defendant's propensity to commit crime. *People v. Pikes*, 2013 IL 115171, ¶ 11. Domestic violence prosecutions are excepted from that rule, however, by section 115-7.4 of the Code of Criminal Procedure (Code), which provides that "evidence of the defendant's commission of another offense or offenses of domestic violence is admissible and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.4(a) (West 2018); see also Ill. R. Evid. 404(b) (eff. Jan. 1, 2011) ("Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith except as provided by *** [section] 115-7.4"); *People v. Dabbs*, 239 Ill. 2d 277, 284-85 (2010) (noting that section 115-7.4 "abrogated in part" the common law rule prohibiting propensity evidence).

¶ 38    Nevertheless, the trial court may bar evidence under section 115-7.4 of the Code if it determines that the risk of undue prejudice from the evidence outweighs its probative value. See *Dabbs*, 239 Ill. 2d at 289-90. In weighing the evidence's probative value and potential for undue prejudice, the court may consider (1) "the proximity in time to the charged or predicate offense," (2) "the degree of factual similarity to the charged or predicate offense," or (3) "other relevant facts and circumstances." 725 ILCS 5/115-7.4(b) (West 2018).

¶ 39    A trial court's decision to admit proof of other crimes is reviewed for an abuse of discretion. *People v. Peterson*, 2017 IL 120331, ¶ 125. "The question is not whether the reviewing court would have made the same decision if it were acting as the trial court." *Id.* Rather, a trial court abuses its discretion only where its decision is "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.). *Id.*

¶ 40    The State's motion to admit proof of other crimes proffered that, on October 25, 2017, Mr. Bronaugh strangled Ms. Sanchez, his ex-girlfriend, over a dispute about childcare. The State sought to introduce that (1) on July 21, 2017, Mr. Bronaugh threatened to kill Ms. Sanchez; (2) on April 7, 2015, Mr. Bronaugh struck Ms. Soriano, whom he was then dating; and (3) on July 13, 2015, Mr. Bronaugh followed Ms. Soriano and stood outside her vehicle while she occupied it. The court barred the evidence as to the July 21, 2017, and July 13, 2015, incidents, but allowed the evidence regarding the April 7, 2015, incident with Ms. Soriano because, although it involved a different victim and occurred over two years prior, the probative value of propensity evidence that Mr. Bronaugh previously struck a domestic partner outweighed its prejudicial effect. At trial, Ms. Sanchez testified that Mr. Bronaugh pulled her back to their apartment and choked her following a dispute over who would care for their daughter and her alleged infidelity. Ms. Soriano, in turn, testified that Mr. Bronaugh asked her to drive him to the emergency room, and when he entered her vehicle, punched her and accused her of infidelity.

¶ 41    The State's motion alleged that, in both instances, Mr. Bronaugh harmed a woman whom he dated. At trial, the witnesses further testified that both incidents involved Mr. Bronaugh's accusations of infidelity. Prior incidents of domestic violence are admissible in a domestic violence prosecution to show the defendant's propensity to commit domestic violence. 725 ILCS 5/115-7.4 (West 2018); *Dabbs*, 239 Ill. 2d at 284-85. While the other-crimes evidence involved Mr.

Bronaugh striking Ms. Soriano, not choking or grabbing her neck, the existence of factual differences does not defeat the admissibility of other-crimes evidence, and general similarities may suffice where the evidence is not offered to prove *modus operandi*. *People v. Arze*, 2016 IL App (1st) 131959, ¶ 93; see also *People v. Martin*, 2012 IL App (1st) 093506, ¶ 39 ("Our supreme court has never suggested that other crimes must be identical to the crime charged before evidence of them is admissible." (Internal quotation marks omitted)). Given the similarities and relevant circumstances of the two assaults, where Mr. Bronaugh battered women he dated while accusing them of infidelity, we cannot say that the trial court's decision to admit Ms. Soriano's testimony, while declining to admit two less-similar incidents, was arbitrary, fanciful, or unreasonable such that no reasonable person would agree. See 725 ILCS 5/115-7.4(b) (West 2018) (court may consider factual similarities and other relevant facts and circumstances).

¶ 42    In so holding, we find Mr. Bronaugh's comparison to *People v. Johnson*, 406 Ill. App. 3d 805 (2010), unpersuasive. In that case, the defendant was convicted of aggravated criminal sexual assault and aggravated kidnaping after the victim testified that the defendant grabbed her in an alley, threatened her, led her to an abandoned building, and orally and vaginally penetrated her. *Id.* at 806. To prove the defendant's propensity to commit sexual assault, the State also called the victim of an uncharged sexual assault, who testified that the defendant pulled her into a vehicle driven by another man, drove her to an abandoned building, and the men orally, anally, and vaginally penetrated her. *Id.* at 807-08. She further testified that she told police the defendant blew cocaine in her face and gave her alcohol. *Id.* at 808. On appeal, we found that the trial court erred in admitting the other-crimes evidence, in part because the other-crimes evidence, unlike the charged offense, involved two assailants, the use of a vehicle, cocaine, alcohol, and anal penetration. *Id.* at 811-12.

¶ 43    Mr. Bronaugh argues that, like *Johnson*, the other-crimes evidence here involved a different victim, a vehicle, and assault on a different part of the victim's body. However, in *Johnson*, the trial court erred in admitting the other-crimes evidence because of the dissimilarities between the assaults "combined with" the failure to meaningfully analyze the probative value of the other-crimes evidence against the risk of unfair prejudice. *Id.* at 812. Indeed, the trial court in *Johnson* stated, while granting the State's motion, that " '[t]he facts are sufficient enough to show arguably a propensity to commit sex crimes by [the defendant], so those crimes will be admitted with a limiting instruction,' " but offered "no assessment at all" of the prejudicial effect. *Id.* at 807, 812.

¶ 44    In contrast, the record here reflects that the trial court meaningfully analyzed whether the prejudicial effect of the other-crimes evidence substantially outweighed its probative value. First, the court denied the State's motion as to Mr. Bronaugh's threat to kill Ms. Sanchez and his violation of Ms. Soriano's order of protection. Further, the court stated that it had considered that the other-crimes incident occurred two years prior and involved a different victim, but nevertheless found that Ms. Soriano's testimony was more probative than prejudicial because it involved Mr. Bronaugh battering a domestic partner. See *People v. Nelson*, 2013 IL App (1st) 102619, ¶ 45 (distinguishing *Johnson* in part because trial court acknowledged dissimilarities between sexual assaults). Thus, the trial court did not abuse its discretion in allowing Ms. Soriano's testimony.

¶ 45    The jury found Mr. Bronaugh guilty of domestic battery for grabbing Ms. Sanchez about the neck. 720 ILCS 5/12-3.2(a)(1) (West 2016). Ms. Sanchez testified that Mr. Bronaugh grabbed her neck, and the jury viewed photographs of bruises to her neck. The police officers and Ms. Martinez also observed her injuries. The jury further heard Ms. Sanchez's call to 9-1-1, in which she struggles to respond to the operator because she starts coughing and wheezing, and then

screams repeatedly. The court issued limiting instructions before Ms. Soriano testified and following closing arguments, which admonished the jury that it was to consider her testimony only as to Mr. Bronaugh's propensity for domestic violence. While Mr. Bronaugh denied grabbing Ms. Sanchez's neck or otherwise getting "physical" with her, Ms. Sanchez's testimony was corroborated by the photographs and other witnesses' observation of her injuries, which her mother testified were not present the day prior. Given the other evidence against Mr. Bronaugh, he cannot show the jury found him guilty for improper reasons or that the admitted evidence of another incident of domestic violence was unduly prejudicial.

¶ 46                                    IV. CONCLUSION

¶ 47     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 48     Affirmed.